## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **BETHESDA ASSET SERVICES, INC.** | : | |
| | : | |
| **and** | : | |
| | : | |
| **LOUIS J. TROTTER, JR.,** | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **Case No. PJM 00-2116** |
| | : | |
| **THE BANK OF NEW YORK** | : | |
| | : | |
| **and** | : | |
| | : | |
| **BNY ASSET SOLUTIONS LLC,** | : | |
| | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION AS TO DAMAGES AND PRELIMINARY FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO DAMAGES FOR LOST OPPORTUNITY AND ATTORNEY'S FEES AND EXPENSES

The above matter was referred to the undersigned by the Honorable Peter J. Messitte pursuant to 28 U.S.C. § 636 (b)(1)(B) for a report and recommendation as to damages and preliminary findings of fact and conclusions of law as to damages for lost opportunity and for attorney's fees and expenses (Docket No. 110). The court took seven days of testimony on March 17, 18, 19, 20, 21, 26 and 27, 2003. The plaintiffs filed initial proposed findings of fact on March 12, 2003 (Docket No. 120) and final proposed findings of fact on June 20, 2003 (Docket No. 134). The defendants filed a memorandum on damages containing initial proposed findings of fact on March 10, 2003 (Docket No. 119) and proposed findings of fact on June 20, 2003 (Docket No. 135). The plaintiffs filed an

Affidavit - Plaintiffs' Statement of Additional Attorneys' Fees and Expenses - on September 24, 2004

(Docket No. 144) to which the defendants replied on October 5, 2004 (Docket No. 145) and the

plaintiffs responded on October 8, 2004 (Docket No. 146).

## JUDGE MESSITTE'S RULING ON LIABILITY

Judge Messitte conducted a bench trial on the liability phase of this case from January 7 - 10,

2003.  Judge Messitte entered judgment on liability with respect to Count I of the Amended Complaint

in favor of plaintiff Louis J. Trotter, Jr. ("Trotter") and against defendants The Bank of New York

("BNY" or the "Bank") and BNY Asset Solutions LLC, ("Asset Solutions" or "BNYAS") jointly and

severally.  Trotter alleged in Count I that the defendants breached their contractual obligations to him

under his contract of employment (the "Employment Agreement") by terminating his rights and duties as

Chief Executive Officer of Asset Solutions on May 17, 2000 and failing to pay his salary for the

remainder of that calendar year.  Trotter is entitled to his salary for the remainder of 2000 plus costs

and prejudgment interest.

Judge Messitte entered judgment on liability with respect to Count II of the Amended

Complaint in favor of plaintiff Bethesda Asset Services Inc. ("BASI") and against the defendants BNY

and Asset Solutions jointly and severally.  BASI alleged in Count II that the defendants breached their

contractual obligations to BASI under an Asset Purchase Agreement (the "APA") dated December 15,

1998 when the defendants failed and refused to pay BASI thirty percent (30%) of certain of Asset

Solutions' net income for calendar years 2000, 2001, and 2002.  Judge Messitte ruled that BASI is

entitled to thirty percent (30%) of certain of Asset Solutions' net income for calendar years 2000, 2001

and 2002 plus costs and prejudgment interest.

Judge Messitte granted declaratory relief in favor of Trotter and against BNY and Asset Solutions by ruling that Trotter was relieved of any further obligations under the Non-Competition and Non-Solicitation Agreement entered into between the parties dated December 15, 1998.  In addition, Judge Messitte reserved ruling on two issues: 1) whether Trotter may seek, as part of the damages to be awarded him, damages for his lost opportunity to obtain employment in the loan servicing industry, and to compete with the defendants by reason of his continued obligations under the Non-Competition and Non-Solicitation Agreement for the period May 30, 2000 to January 10, 2003 (the "Non-Competition Damages"); 2) whether Trotter is entitled to an award of attorney's fees and expenses pursuant to the terms of the Asset Purchase Agreement.  Judge Messitte directed the undersigned to take testimony on these two issues and make preliminary findings of fact and conclusions of law with regard to them.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

For purposes of these Findings of Fact and Conclusions of Law, the court adopts and incorporates by reference Judge Messitte's Findings of Fact and Conclusions set forth in his opinion rendered January 10, 2003.  Docket No. 108 (Transcript of proceedings held before the court on 1/10/03.  Those findings will not be repeated here except as is necessary to this court's findings of fact and conclusions of law.

## Count I - Salary Owed by Defendants to Trotter

1) Plaintiff, BASI, is the successor by name change to Trotter Kent, Inc. ("TKI").

2) Plaintiff, Trotter, is a principal of BASI.

3) Defendant, BNY or the ("Bank"), is a commercial bank with its principal place of business in

3

New York.

4) Defendant, Asset Solutions or "BNYAS", is a wholly owned subsidiary of the Bank and is the successor by merger to BNY Trotter Kent, Inc.

5) On December 15, 1998, TKI, predecessor to BASI, and the principals of TKI, Trotter and David D. Kent ("Kent"), entered into an Asset Purchase Agreement with the Bank whereby the Bank agreed to purchase, and TKI agreed to sell, substantially all of TKI's assets. Under the APA, the Bank agreed to employ Trotter as President and Chief Executive Officer ("CEO") and Kent as Chief Operating Officer ("COO") of BNY Trotter Kent LLC ("BNYTK"). BNYTK, a subsidiary of BNY, was formed to hold and own the assets of TKI. BNYTK was subsequently consolidated with and into Defendant Asset Solutions.

6) By letter of December 21, 1998, BNY and Trotter agreed that Trotter would join BNY as President and CEO of BNYTK as well as a Vice President of BNY. Trotter was to be paid $275,000 on an annual basis. In the event Trotter's employment with BNY was terminated without Cause (as defined in the December 15, 1998 Non-Competition/Non-Solicitation Agreement with BNY) on or before February 13, 2004, Trotter was to continue to receive his salary through the earlier of (i) the end of the calendar year in which such termination occurred, or (ii) February 13, 2004.

7) Closing on the APA occurred on January 7, 1999.

8) Trotter began his employment with BNY on January 8, 1999.

9) Judge Messitte found that Trotter was terminated without cause on May 17, 2000. At that time his salary was $275,000 per annum. In 2000 BNY paid Trotter the sum of $105,846.34. The

remaining unpaid salary for 2000 is $169,153.66.  Trotter is entitled to prejudgment interest[1] at the rate

of 9% per annum.  The per diem rate for 9% of $169,153.66 is $41.71.  One thousand, nine hundred

and thirty-two (1,932) days have elapsed between May 17, 2000 and August 31, 2005.  Prejudgment

interest as of August 31, 2005 totals $80,583.72. (1932 x $41.71 = $80,583.72).

### Count II - Calculation of BASI's Thirty Percent (30%)
### of Net Income for Years 2000, 2001 and 2002

10) At the time of the APA, TKI was engaged in the business of loan servicing, asset

management, investor reporting and servicing asset-backed securities.  TKI was one of only twenty

companies that were "rated" by certain rating agencies as qualified to service defaulted loans held by

publicly traded entities.  BNY determined to acquire TKI, including TKI's special servicer rating.

11) Pursuant to the APA, the purchase price for TKI's assets sold to the Bank had two parts.

The initial payment was $5,000,000.  Pursuant to Section 2.05(b) of the APA, the Bank further agreed

to pay to BASI amounts equal to thirty percent (30%) of all of the net income of Asset Solutions for

calendar years 1999, 2000, 2001 and 2002.

12) In January 1999, the parties entered into an Amendment to the APA which substituted

certain schedules dealing with assigned contracts, other agreements, and intellectual property rights.

This amendment has no bearing on the damage phase of this case.

13) In November 1998 Trotter brought to the Bank's attention that Capital Company of

---

[1] Prejudgment interest in a diversity case is governed by state law.  *See, e.g., Klaxon Co. v. Stentor Elec. Manufacturing Co.,* 313 U.S. 487 (1941); *United States Life Ins. Co. v. Mechanics & Farmers Bank,* 685 F.2d 887, 897 (4th Cir. 1982).  The parties agree that New York law controls.  Under New York Civil Practice Law Sections 5001 and 5004, prejudgment interest is mandatory in actions arising out of breaches of contracts and accrues at 9% per annum.  *See, e.g., Marfia v. T.C. Ziraat Bankasi,* 147 F.3d 83, 90 (2d Cir. 1998).

America Client Services, LLC ("Capital America"), a rated master servicer and an affiliate of Nomura

Asset Capital ("Nomura"), was available for acquisition.  If Capital America was acquired, Asset

Solutions could become a rated master servicer, obtain the necessary technology and trained personnel

to service performing loans and obtain an existing master servicing business.  BNY tasked Trotter,

Kent, BNYTK and BNY personnel to perform the due diligence for the acquisition of Capital America.

Trotter and Kent were principally responsible for the negotiations to acquire Capital America.

14) On April 22, 1999, BNY purchased Capital America for an initial payment of $14 million.

BNY provided all of the capital for this transaction.  Capital America was renamed Asset Solutions,

and BNYTK was consolidated with, and merged into, Asset Solutions.  Trotter became the President

and CEO of the merged company, Asset Solutions.

15) There was a disagreement between BNY and Trotter and Kent as to whether the net

income generated by the acquisition of Capital America would be included in the 30% calculation of

Asset Solutions' net income to which BASI was entitled to receive.  The parties negotiated this issue

and reached an agreement embodied in the July 13, 1999 Second Amendment to the APA ("Second

Amendment").

16) The portion of the Second Amendment concerning the calculation of the 30% of Asset

Solutions' net income to which BASI was entitled to receive is as follows:

> Each installment shall be in an amount equal to thirty percent (30%) of Pre-Tax Net
> Income (as defined below) for the one year period ended on each of December 31,
> 1999, December 31, 2000, December 31, 2001 and December 31, 2002, calculated
> in accordance with Buyer's usual and customary internal accounting practice.  "Pre-Tax
> Net Income" shall mean the revenue derived from the Business minus all expenses,
> losses and other appropriate charges against income related to the conduct of the
> Business as calculated by Buyer in accordance with Buyer's usual and customary

internal accounting practice.  The "Business" shall mean all of the following activities conducted by BNY Asset Solutions LLC: Assigned Contracts, as defined in Section 1.01 of the Agreement; servicing and/or management of distressed or non-performing assets; special servicing of mortgage loans securitized for CMBS transactions; servicing, due diligence, asset management and related services for commercial lenders, REITs and other real property portfolio and mortgage owners and investors; servicing and back-up servicing for asset-backed financings and due diligence analysis and services for investors and arrangers of asset-backed and mortgage-backed debt financings but shall not include Primary and Master Servicing activities pursuant to Servicing Agreements (as that term is defined in the Limited Liability Company Interest Purchase and Sale Agreement by and among The Capital Company of America LLC, Nomura Holding America, Inc. and Buyer dated March 30, 1999), and Primary and Master Servicing of mortgage loans securitized for CMBS transactions [hereinafter, the "Nomura Purchase Agreement"].

   Buyer shall calculate the Pre-Tax Net Income regardless of any future mergers or consolidations or additional lines of business of BNY Asset Solutions LLC by maintaining internal records, in accordance with Buyer's usual and customary internal accounting practice for the Business.

   17) "Servicing Agreements",  referred to above, are defined in the CCA Purchase and Sale Agreement as "collectively, all contracts, agreements or indentures pursuant to which [the Capital Company of America Client Services LLC ("CCA")], is performing, or has performed in the past, mortgage servicing with respect to mortgage loans."  The Servicing Agreements the parties agreed would be excluded from the calculation of Net Income were expressly limited to those servicing agreements with Nomura that were in existence on March 30, 1999, and acquired pursuant to the Nomura Purchase Agreement.

   18) The Second Amendment did not exclude from BASI's Net Income calculation the revenues from servicing agreements (or amendments to any servicing agreements) entered into after March 30, 1999.  Any additional loans serviced by Asset Solutions under any contract with Nomura after March 30, 1999, which were not then securitized as part of a Commercial Mortgage-Backed

Securities ("CMBS") transaction, were also not to be excluded from the calculation of Net Income to BASI.

19) The second category of excluded revenue was primary and master servicing of mortgage loans, securitized in CMBS transactions.  If the loans were securitized as part of a CMBS transaction and Asset Solutions were performing the primary and master servicing, then such revenue is to be excluded.  If the loans had not been securitized, or the loans are not mortgage loans but some other form of asset-backed securities, such revenue is not to be excluded from BASI's Net Income calculation.

20) Unless explicitly excluded from income by the Second Amendment, all income of  Asset Solutions is to be included in the calculation of BASI's share of Net Income under the APA, as amended.

21) The parties further agreed that because the Bank had excluded BASI from benefitting from the income related to the Capital America acquisition and its contemplated CMBS business, BASI was not required to bear the cost of the platform located in Dallas, Texas to support the business. However,  BASI's side of the business was encouraged to use the Dallas platform and would only pay for any additional incremental costs resulting from such use.

22) The Second Amendment required the Bank and Asset Solutions to maintain internal records, in accordance with the Bank's usual and customary internal accounting practice for the defendant's business, reflecting the separate income and expense of the "Business" to be included in the calculation of Net Income and the non-"Business" income and expenses to be excluded from such calculation.

8

23) The Bank and Asset Solutions contend that no separate record keeping method or procedure was required by the Second Amendment.  Rather, the requirement is that the calculation be made from records which are maintained in the ordinary course of business.  The court does not find this contention persuasive.  The term "internal records" is construed by the court to require a separate set of internal records, apart from the Bank's normal records.  These "internal records" are to be kept in accordance with the Bank's "usual and customary internal accounting practice."

24)  The defendants failed to comply with the requirements of the Second Amendment to maintain these internal records throughout the period 2000-2002.  The defendants had no "customary internal accounting practice" with respect to keeping separate income and expense records as required in the Second Amendment.  As part of the instant litigation, the defendants prepared various documents purporting to separate the revenues and expenses of the "Business."

25) In early 2000, before the disputes that gave rise to the instant litigation arose, the parties undertook to calculate the revenues and expenses of the "Business" and thus, the thirty percent (30%) of the Net Income, due and payable to BASI for 1999.  The general "platform" costs related to the Capital America acquisition were not included in the calculation of BASI's share of Net Income for 1999.  Only those people who were specifically performing the contracts attributable to BASI's "Business" were charged to BASI.

26) The parties' treatment of the revenues and expenses of Asset Solutions for 1999, a time when the parties were not in litigation, should serve as the basis for determining what should and should not be included in the calculation of the Net Income payable to BASI for the period 2000-2002.

27) In early 2000, the parties considered the revenues and expenses of Asset Solutions in

9

1999, negotiated various issues regarding those numbers, and calculated the first 30% Net Income

figure payable to BASI.  BASI was paid $302,271 as the 1999 installment.  No further payment for

1999 is due.

28) Under the Second Amendment the calculation of BASI's Net Income was similar to

calculating the net income of a division of a larger company.  The BASI "division" could be profitable,

even if Asset Solutions as a whole was unprofitable, and in a similar manner, the BASI "division" could

be unprofitable, even if Asset Solutions as a whole was profitable.  If the BASI "division" was

unprofitable, then it would have no Net Income and no 30% distribution would be due.  To the extent

BASI's Net Income for a given year exceeded the overall Net Income of Asset Solutions for such

year, that is simply the result of giving effect to the agreement of the parties.

29) The proper computation of BASI's revenue for 2000, 2001 and 2002 will now be

addressed.  With respect to the Assigned Contracts category of revenue, the parties agree that the

2000 revenue was $302,037 and the 2001 revenue was $75,916.  The parties do not agree with

respect to the 2002 Assigned Contracts revenue.  The court finds that BASI's 2002 Assigned

Contracts revenue totals $61,753 which includes: a) $6,071 under the RTC Trust contracts; b)

incentive fees under the Driggs asset management contract of $46,682 representing 5% of the net

proceeds received by the Driggs Creditors' Trust from the liquidation of the Trust's interest in Cecil

Sand & Gravel ($636,296), the Trust's interest in Westphalia ($97,348) and the Trust's interest in the

HGR Note ($200,000); c) $9,000 representing custodial fees for the Driggs Creditors' Trust for 12

months at $750 per month. The court declines, as requested by BASI, to impute $50,000 in billings for

asset management services to the Creditors' Trust which were never billed or accrued by Asset

10

Solutions. The court disallows the $53,334 write off by Asset Solutions for the Driggs matter as the

defendants did not disclose to the auditors that they held at least $316,000 in cash for the Driggs

Creditors' Trust at year end 2002 and also managed other assets having significant value.

30) The parties agree that the CMBS Special Servicing category of revenue in 2000 was

$219,581.  There was no revenue in this category in 2001 or 2002.

31) The revenue for Services for Commercial Lenders, as reported by Asset Solutions, are set

forth in Plaintiffs' Exhibit 199.   There are 46 sources of revenue under Services for Commercial

Lenders.  The parties disagree on 14 entries and agree on 32. The court will adopt as revenue for the

years 2000, 2001 and 2002 those 32 entries for which the parties have no disagreement as they are

listed on Plaintiffs' Exhibit 199.  Each of the 14 entries on which the parties disagree will be discussed

seriatim.

32) BASI objects to Asset Solutions imposing a net write-off of $35,142 in 2002 with respect

to Amerifoods' account receivable.  The court accepts Asset Solutions' explanation that it was not paid

by Amerifoods.  Amerifoods went into bankruptcy and the account receivable was written off.

33) Asset Solutions imposed a net write-off in 2000 of $18,750 with respect to Oneita's

account receivable.  BASI objects.  Asset Solutions contends it was not paid by Oneita and the

account was written off after Asset Solutions' accountants approved the write-off.  BASI counters that

Asset Solutions' own ledgers reflect that in 2001, the amount of cash under the control of Asset

Solutions with respect to Oneita ranged from $20,809 to $58,933 and in 2002 ranged from $21,927 to

$22,046.  In each case this was more than enough to satisfy Asset Solutions' claim against Oneita.  In

addition, the agent services contract used by Asset Solutions specifically provided that Asset Solutions

11

could retain from amounts collected on behalf of the lenders funds sufficient to pay all outstanding fees and expenses if not paid by the Borrower. The court finds that Asset Solutions erroneously wrote-off $18,750 with respect to Oneita, and will add this amount to the 2000 Oneita entry.

34) Asset Solutions imposed a net write-off in 2002 of $25,000 with respect to Pioneer's account receivable. Asset Solutions contends it was not paid by Pioneer. Pioneer went into bankruptcy, and Asset Solutions elected to write-off the account receivable. BASI counters that Asset Solutions' ledgers reflect that in June 2001 Asset Solutions recorded income of $40,833 and in June 2001 held cash of not less than $100,890. As previously noted, Asset Solutions had the right to collect the account receivable under its agent services contract. The court does not find that Pioneer's bankruptcy impaired the collection of the account receivable. Either the funds in the account were payments by Pioneer already tendered to the lender(s) and therefore were funds of the lender(s) and not part of Pioneer's bankruptcy estate, or the funds, while paid to Asset Solutions for the lenders, remained Pioneer's and were, not withstanding the bankruptcy of Pioneer, nevertheless subject to setoff by Asset Solutions as a mutual debt (11 U.S.C. § 553). The court finds that Asset Solutions erroneously wrote-off $25,000 with respect to Pioneer and will add this amount to the 2002 Pioneer entry.

35) Asset Solutions imposed a write-off with respect to Oppenheimer Senior contract and account receivable of $129,291 in 2002. BASI claims that the actual write-off in 2002 was substantially greater than represented by Asset Solutions and totaled $227,910. The court finds that the "Oppenheimer contract" was not a contract between Asset Solutions and Oppenheimer, but rather it was a contract between Asset Solutions and the Bank of New York where Asset Solutions served as

12

a subservicer for loans in the Oppenheimer portfolio. As originally agreed between Asset Solutions and the Bank of New York, Asset Solutions was to be paid $200 per month per loan record by the Bank. On June 5, 2000, shortly after Mr. Trotter was terminated and left Asset Solutions, the Bank of New York required its subsidiary, Asset Solutions, to reduce its fees to $135 per month per loan record, for loan records up to 100, and $125 per month per loan record for loan records in excess of 100. It appears that the Bank caused Asset Solutions to retroactively reduce its bill from the inception of Asset Solutions' performance. On January 11, 2002, the Bank of New York caused Asset Solutions to reduce even further its fees to $60 per month per loan record. The court finds that the Bank of New York had sufficient assets to pay the account receivable; there was no defense by the Bank of New York to payment of the account receivable and the Bank of New York forced the write-off by its subsidiary, Asset Solutions. The court will eliminate the write-off of $129,291 in 2002 by Asset Solutions.

36) The court finds that the Bank of New York required Asset Solutions to reduce its servicing fees on the Oppenheimer contract to assist the Bank of New York in retaining its significant client relationship with Oppenheimer. Because the Bank of New York and Asset Solutions filed consolidated financial statements and consolidated tax returns, losses and expenses could be shifted from the Bank of New York to Asset Solutions, and there would be no effect on their consolidated financial statements or tax returns. However, a shifting of losses and expenses can have a significant adverse effect on Asset Solutions' income and BASI's right to share in such income. The court will calculate Asset Solutions' revenue from the Oppenheimer contract during each of the years 2000, 2001 and 2002 at the originally agreed price of $200 per month per loan record. The court has adjusted Asset Solutions'

stated income for Oppenheimer from $135 per loan record in 2000 and 2001 and $60 in 2002 to the

original contract price of $200 per loan record.  The court finds that the Oppenheimer Senior contract

income, includable in the calculation of BASI's revenue, is as follows: 2000: $229,812 (200/135 x

$155,123); 2001: $765,037 (200/135 x $516,400); and 2002: $328,730 (200/60 x $98,619).

37) The parties disagree as to whether the ten revenue items identified by Plaintiffs as "Primary

& Interim Non-CMBS Servicing" are properly included in the revenue calculation of BASI's Net

Income.  The resolution of this dispute involves an interpretation as to whether each of the ten disputed

revenue items is included in BASI's revenue under the terms of the July 13, 1999 Second Amendment

to the APA.  An examination of each of the ten disputed revenue items follows.

38) Beckman 2000.  Asset Solutions provided servicing pursuant to an agreement with Short-

Term Asset Receivable Trust dated April 11, 2000 for the Beckman 2000 contract. Asset Solutions

submits that Beckman 2000 was a master servicing agreement for mortgage loans securitized for

CMBS transactions and are thus excluded from BASI's revenue pursuant to the Second Amendment.

BASI submits that Beckman 2000 was a credit lease securitization and not a CMBS securitization.

39) CMBS stands for commercial mortgage-backed securities.  A CMBS is a pool of

commercial loans that have been assembled and placed into a trust.  Various classes of bonds are

issued by the trust with different ratings on the bonds.  As payments are received to pay off the

commercial loans, those proceeds are used to pay off the bonds.  A CMBS has multiple classes of

debt.  There are different tranches[2] in a CMBS transaction, *e.g.,* Triple A, Double A, Triple B, Double

---

[2] A piece, portion or slice of a deal or structured financing.  This portion is one of several related securities
that are offered at the same time but have different risks, rewards and/or maturities.  "Tranche" is the French word for
"slice".  Investopedia.com, http://www.investopedia.com/terms/t/tranches.asp

B, on down to a nonrated tranche.  In a CMBS transaction, the investor at the very top, the Triple A

bond, receives the lowest interest rate and gets paid first.  The lowest tranche receives the highest rate

or no interest rate because that investor may have a residual equity interest.  If the trust begins to lose

money, the investor in the lowest tranche loses his or her entire investment, before an investor in the

next higher tranche loses any money.  The underwriting basis for a mortgage loan in a CMBS

transaction is the value of the property and the underlying cash flow.

40) A credit lease securitization has only one tranche of collateralized securities issued, as

opposed to multiple tranches normally found in a CMBS.  The underlying securities are credit lease

loans.  The underwriting basis for a credit lease securitization focuses on the creditworthiness of the

tenant, and not the value of the property.  The securitization is the credit rating of the tenant.  The

analytics to structure a credit lease securitization are different from those in a CMBS securitization.

41) Asset Solutions contend that because Nomura and Asset Solutions treated the Beckman

2000 contract as a "Future CMBS Transaction" under the CCA Purchase and Sale Agreement, dated

March 30, 1999, for the purpose of calculating the purchase price adjustment due from Nomura to the

Bank of New York, the court should also treat it as a CMBS.

42) Under the terms of the CCA Purchase and Sale Agreement, Nomura agreed that, for a two

year-period, it would use its best efforts to cause Asset Solutions to be appointed master servicer on

"Future CMBS Transactions" until the aggregate initial unpaid principal balance of such "Future CMBS

Transactions" equaled two billion dollars.  If Nomura failed to cause Asset Solutions to be appointed

master servicer on "Future CMBS Transactions" in that amount, Nomura agreed to repay part of the

purchase price BNY had paid for the CCA membership interests.  If Nomura caused Asset Solutions

to be appointed master servicer on future CMBS deals in excess of two billion dollars, an inverse

adjustment would be made.  This adjustment, referred to by the parties as a "true-up[3]", for the "Future

CMBS Transactions" was to be made on the Second Anniversary of the closing date of the CCA

Purchase and Sale Agreement.

43) "Future CMBS Transactions" are defined in Section 1.1 of the CCA Purchase and Sale

Agreement to mean:

> "any securitization meeting the following criteria:
>
> (i)     such securitization is consummated on or after the earlier of (x) the approval of the Company to be master servicer for such securitization by each Rating Agency rating any class of certificates issued pursuant to such securitization or (y) September 1, 1999;
>
> (ii)    such securitization is consummated before the second anniversary of the Closing Date;
>
> (iii)   such securitization includes mortgage loans substantially originated by [the Capital Company of America LLC]; and
>
> (iv)   the certificates issued pursuant to such securitization are rated by at least one Rating Agency."

44) In the Second Anniversary "true-up," completed in April 2001, four "Future CMBS

Transactions" were identified and accounted for by Nomura and BNYAS.  Included among those four

are the three contracts at issue here: BH Finance (Accor II), BH Trust (Accor I), and Beckman.

Amounts earned under these three agreements were identified by Nomura and BNYAS as CMBS

transactions and counted towards the guaranteed amount of  "Future CMBS Transactions" under the

---

[3] To make level, square or balance.  Answers.com, http://www.answers.com/topic/true-true-up

CCA Purchase and Sale Agreement.  According to the Bank, this was done because these accounts

involved securitizations of mortgage loans substantially originated by Nomura where the certificates

issued in the securitizations were rated by at least one Rating Agency.  BNYAS alleges that it had no

incentive to include BH Finance, BH Trust or Beckman as "Future CMBS Transactions" in the Second

Anniversary "true-up" with Nomura if they were not actually "Future CMBS Transactions".  If these

three agreements had not been identified and included as "Future CMBS Transactions", Nomura would

have had to send BNYAS other CMBS transactions, or have had to pay BNY an amount as an

adjustment to the CCA purchase price.

45) BASI contends that Nomura's and the Bank's definition of a "Future CMBS Transaction"

is broader than a true CMBS transaction.  There are securitizations that, as with credit leases, include

mortgage loans but are not classified as CMBS transactions.  Examples of transactions where the

parties both agree are not CMBS transactions and that the revenue derived therefrom was included as

part of BASI's revenue are (i) the CAPTEC contract, (ii) the Falcon contract, and (iii) the IFC

franchise loans.

46) The Bank's and Nomura's definition of "Future CMBS Transactions" for purposes of the

Capital America transaction is not dispositive of whether a transaction is a CMBS transaction for

purposes of the Second Amendment between the Plaintiffs and the Bank.  The court finds that Mr.

Trotter's testimony on this issue to be more persuasive than that of Mr. Richard Blake.[4]

---

[4] At the time of his testimony Richard Blake was the vice president and controller of BNYAS.  He is a
Certified Public Accountant with twenty-three years of experience in the financial services industry.  On June 19,
2003, the Plaintiffs filed a Motion to Strike Certain Trial Testimony of Richard Blake  (Docket No. 132).  Specifically,
the Plaintiffs sought to have Mr. Blake's testimony regarding the revenue issues pertaining to the (i) Beckman 2000,
(ii) ACCOR, (iii) Bernard Primary, (iv) Nomura Servicing, (v) UBS Start, (vi) Warburg Dillon Read, (vii) Beal Bank, and

47) The Beckman 2000 credit lease securitization is not a CMBS transaction excluded from

BASI's revenue under the Second Amendment, nor is it a Servicing Agreement as defined in the

Second Amendment.  The Beckman 2000 income is to be included in BASI's revenue as follows: (i)

2000: $22,534; (ii) 2001: $92,238; and (iii) 2002: $92,316.

48) <u>Beckman Interest</u>.  For the reasons set forth in paragraphs 38-46, the court finds that the

account interest related to Beckman 2000 is includable in BASI's revenue, as follows: (i) 2000:

$22,843; and (ii) 2001: $22,843.

49) <u>Bernard Primary</u>.  Asset Solutions performed servicing pursuant to an agreement with

Bernard Financial Group dated effective June 1, 1999.  Asset Solutions neither performed nor was

obligated to perform the duties ordinarily performed by a primary or master servicer.  Duties reserved

to Bernard, and not performed by Asset Solutions, included the collection of loan payments, billing,

cash processing, and the administration of tax and insurance escrows.  Under the contract, Asset

Solutions acted in a subsidiary role as an independent contractor and not as either a master or primary

servicer.  The services provided by Asset Solutions were services for a commercial lender that are not

the servicing of a CMBS securitization and are not excluded from BASI's revenue.  The revenues for

the Bernard Financial Group contract are includable in BASI's revenue, as follows: (i) 2000: $8,016;

(ii) 2001: $39,041; and (iii) 2002: $41,066.

50) <u>New Nomura Loans (Providence Place)</u>.  In April 2000 two loans (Loan Numbers

019267 and 019268), belonging to Nomura which were serviced pursuant to the CCA Interim

(viii) Providence Place servicing contracts struck.  By letter order dated August 8, 2003, the court denied the motion
to strike the testimony of Mr. Blake.  *See* Docket  No.140.

Servicing Agreement ("ISA"), were converted by Nomura from non-cash flow construction loans into cash flow construction loans, and reconfigured into three loans.  BNYAS was notified of this change in May 2001.  A "non-cash flow construction loan" is any construction loan where (i) the loan proceeds have not been fully funded to the borrower or (ii) the related mortgaged property is not generating cash flow to service the debt.  A "cash flow construction loan" is any construction loan where (i) the loan proceeds have been fully funded to the borrower or (ii) the related mortgaged property is generating cash flow to service the debt.

51) BASI contends, because the three loans were not part of the Servicing Agreements at the time of the Capital America transaction and the services provided are not master or primary servicing of CMBS transactions, that the servicing income related to these loans is to be included in the calculation of BASI's revenue.  To support its position, BASI submits that the "new" loans have new loan amounts, new interest rates and new loan numbers and that the two old loans were marked "paid off".

52) The court finds persuasive the testimony of Mr. Blake explaining the transition between two and three line items for the New Nomura Providence Place loans, the change in loan numbers, loan amounts and other details related to the loans' conversion from interim to permanent financing and not the creation of new loans.  The new loan numbers originated because Nomura's computer system required a change in loan numbers to track the conversion from interim to permanent financing.  The use of the term "paid off" in the notes on the Nomura Project spreadsheets was an internal BNYAS notation, reflecting a maintenance function associated with the Nomura computer system, not a "pay off" as that term might be used in the vernacular.  These loans are part of the revenue being earned under the CCA ISA and BASI is not entitled to share in their revenue.

19

53) <u>UBS START</u>.  Prior to the date of the CCA Purchase and Sale Agreement, Nomura

borrowed money from UBS and pledged certain mortgages as collateral for the loan.  When the

mortgages were pledged to UBS they were placed into a trust, the Short Term Asset Receivable Trust

("START").  AMRESCO Services L.P. ("AMRESCO") was made the servicer, and CCA became

the sub servicer.  The AMRESCO Sub-Servicing Agreement was one of the "Servicing Agreements,"

listed in Exhibit A to the CCA Purchase and Sale Agreement.  The parties agree that the UBS START

arrangement is not either a master or primary servicing for a CMBS securitization.  Asset Solutions

performed servicing for UBS START pursuant to a Servicing Agreement with START dated

December 11, 1999.  This agreement was not in effect at the time of the Capital America transaction.

54) The Bank alleges that the UBS START income should not be included in BASI's revenue

because: (i) the loans were initially serviced for Nomura under the sub-servicing agreement between

Asset Solutions (by assignment from Capital America Client Services) and AMRESCO, as part of the

Capital America Sale; (ii) the Interim Service Agreement contemplated that an Acknowledgment

Agreement could have been executed with Nomura to pass "full servicing" of these loans from

AMRESCO to Asset Solutions; (iii) the "true-up" of the calculation of the guaranteed servicing income

between Asset Solutions and Nomura included this income; and (iv) although the agreement at issue

was executed in the latter part of 1999, servicing revenue from this UBS agreement was not included in

BASI's revenue in the calculation of BASI's Net Income in 1999.

55) The court finds that the UBS START agreement is a separate, new contract with a different

entity, that it did not arise under an Acknowledgment Agreement with Nomura, and that the prior sub-

servicing agreement with AMRESCO was terminated.  The fact that assets could be added to servicing

by an Acknowledgment Agreement is a bar to BASI sharing in the related servicing revenue.  IFC franchise loans were added to Asset Solutions' servicing with Nomura by an Acknowledgment Agreement in 1999 and the related servicing revenue was included in BASI's revenue for 1999.

56) Consistent with the court's finding with respect to the Beckman 2000 contract, the court finds that the treatment of the servicing revenue related to UBS START by Asset Solutions and Nomura as part of the "true-up" of guaranteed servicing revenue at the end of the Interim Servicing Agreement is not dispositive of the treatment for the purposes of the Second Amendment.

57) The UBS contract listed as "Not Included in TK incentive" in the Business Activity Revenue 1999 Report (Def. Ex. 145, Bates No. D 005757) is not the same UBS contract at issue. The 2000 annualized revenue from the UBS contract identified in Def. Ex. 145 was $4,375.  The actual revenue from the UBS START contract in 2000 was $1,124,103.  There was more than one UBS contract.  The court finds that the UBS contract that was "Not Included in TK incentive" was the Four Times Square (UBS) contract reflected in Def. Ex. 89 for which the 2000 revenue amounted to $4,444 - very close to the amount projected in 1999 as reflected in Def. Ex. 145.

58) The servicing revenue from the UBS START agreement is a post-Capital America transaction servicing contract and is to be included in BASI's revenue under the Second Amendment. The revenue from the UBS START contract is as follows: (i) 2000: $1,124,103; (ii) 2001: $98,655; and (iii) 2002: $96,233.

59) Warburg Dillion Read ("WDR") Interim Servicing Agreement Revenue.  BNYAS was unable to locate a signed copy of the Warburg Dillion Read Interim Servicing Agreement.  An unsigned copy of an agreement (Def. Ex. 77), pursuant to which Asset Solutions provided interim servicing for

WDR, was admitted into evidence.  The court finds that Def. Ex. 77 is the agreement governing the

WDR revenue.  The agreement is neither a "Servicing Agreement" under the CCA Purchase and Sale

Agreement, nor a securitized CMBS mortgage.  BNYAS submits that the revenue should be excluded

from BASI's revenue because in the calculation of the 1999 payment to BASI, the parties excluded

$3,000 in revenue denominated "WDR" under CMBS primary servicing.  *See* Def. Ex. 145.  BNYAS

had two servicing agreements with WDR - one for Master Servicing and one for Interim Servicing.

The court finds that the revenue excluded from BASI's income in 1999 was related to the Master

Servicing Agreement, not the Interim Servicing Agreement.  The revenue of $8,106 in 2000 for interim

servicing is properly included in BASI's revenue.

   60) Beal Bank.  Asset Solutions provided servicing for Beal Bank pursuant to an agreement

dated December 22, 2000.  The agreement shows that Nomura had sold loans from its portfolio (then

being serviced by BNYAS pursuant to the CCA ISA) to Beal Bank, and that Beal Bank then

contracted with Asset Solutions to service these loans for an interim period which would end on or

before February 28, 2001.  The services provided were servicing for a commercial lender and were

primary or master servicing for a CMBS securitization and thus the revenue from these loans under the

Second Amendment is attributable to BASI.  The revenue of $25,536 in 2001 is properly included in

BASI's revenue.

   61) Accor/BH Finance (Accor II).  Asset Solutions provided servicing pursuant to an

agreement with Short Term Asset Receivable Trust dated December 20, 2000.  In accord with the

court's analysis of the proper treatment of the Beckman 2000 contract revenue (paragraphs 38 - 47),

the Accor/BH Finance (Accor II) contract is a credit lease securitization and not a CMBS

securitization.  The following revenue is therefore attributable to BASI: (i) 2000: $8,999; (ii) 2001: $104,653; and (iii) 2002: $104,640.

62) BH Trust (Accor I).  Asset Solutions provided servicing pursuant to an agreement with Short Term Asset Receivable Trust dated March 30, 2001.  As with the Beckman 2000 contract discussed above (paragraphs 38 - 47) and the Accor/BH Finance (Accor II) (paragraph 61), this is also a credit lease securitization and not a CMBS securitization.  The following revenue is therefore attributable to BASI: (i) 2001: $33,881; and (ii) 2002: $41,205.

63) Nomura post-April 2001: The parties agree that the revenue BNYAS earned from "Servicing Agreements" during the first two years following the close of the Nomura Purchase and Sale Agreement are excluded from BASI's revenue.  The parties disagree on the treatment of revenue earned after April 21, 2001 arising from the Nomura Purchase and Sale Agreement. Under the terms of the Nomura Purchase and Sale Agreement a "true-up" of the guaranteed income was to occur on the first and second anniversaries of the closing of the deal.  The second anniversary "true-up" was to occur on April 21, 2001.

64) BASI contends, with the support of the Mr. Trotter's testimony, that when the Second Amendment was negotiated, what was sought to be excluded by BNY from BASI's revenue under the concept of "Servicing Agreements" was solely the income guaranteed by Nomura for the two year period prior to the "true-up."  Therefore, any servicing income received by Asset Solutions from Nomura subsequent to the two year term of the Interim Servicing Agreement would be includable as BASI's revenue because this servicing would not be pursuant to a Servicing Agreement in effect on the date of the Purchase and Sale Agreement, and would be servicing for a commercial lender (Nomura)

23

that was not CMBS primary or master servicing.

65) BNYAS argues that there is no legitimate contractual or factual basis for BASI's position. The two year income guarantee does not transform BNY revenue into BASI revenue.   The Second Amendment specifically excludes from BASI revenue earned from "Primary and Master Servicing activities pursuant to Servicing Agreements (as that term is defined in the [CCA Purchase and Sales Agreement])."  "Servicing Agreements" are defined in the CCA Purchase and Sale Agreement as "all contracts, agreements or indentures pursuant to which the Company is performing, or has performed in the past, mortgage servicing with respect to mortgage loans."  The CCA ISA is identified as one of the contracts pursuant to which CCA was performing servicing at the time of the CCA Purchase and Sale Agreement.  While the CCA ISA included various termination provisions, the agreement did not end on any date certain.  The agreement continued until one or the other of the parties acted to terminate.  Only the guaranteed income terminated at the end of two years.  Thus any Nomura post-April 2001 income is excluded from BASI.

66) The court finds that the April 21, 2001 deadline related only to the guaranteed consideration to be earned by BNYAS under the CCA Purchase and Sale Agreement.  The language of the Second Amendment clearly excludes the CCA Purchase and Sales Agreement from BASI revenue.  Mr. Trotter's testimony concerning the intent of the parties when drafting the language contained in the Second Amendment is inadequate to overcome the clear language contained in the agreement.  The Nomura post-April 2001 revenue is not BASI revenue.

67) Asset Backed Servicing: There is no dispute between the parties that all asset-backed servicing revenue is includable as BASI revenue with the exception of one item - NACC Franchise.

24

The NACC Franchise revenue was derived from the IFC loans, which were added to the Nomura

Interim Servicing Agreement pursuant to an Acknowledgment Agreement dated November 9, 1999.

Revenue with respect to these loans was included in BASI's revenue in 1999.  The treatment of the

income in 1999 is determinative and the $1,295 of revenue attributable to the NACC Franchise loans

in 2000 is allocated to BASI.  The total revenue attributable to BASI for Asset Backed Servicing is as

follows: (i) 2000: $293,440; (ii) 2001: $1,114,201; and (iii) 2002: $2,121,706.

68) <u>Account Interest</u>: Pursuant to various agreements, BNYAS earned and was entitled to

keep various fees (*e.g*., late payment loan service transaction fees, charges for beneficiary statements or

demands, amounts collected for checks returned for insufficient funds and various other miscellaneous

charges) and interest earned from accounts into which clients' funds were deposited.  The parties agree

that, with the exception of the overall "BNYAS accounts," account interest reflects various fees and

interest earned on balances held by Asset Solutions in specific accounts that are attributable to specific

servicing contracts, and that interest should be allocated in accordance with the allocation of the specific

servicing contracts.  There is no dispute between the parties as to the specific amounts of account

interest earned by Asset Solutions.

69) The "BNYAS accounts" that are in dispute are  UBS START, WDR Interim, the New

Nomura Loans and the Nomura post April 2001 revenue.   The parties are in agreement that the

ICCMIC/Falcon interest is BASI revenue. The resolution of whether to allocate the account interest

revenue from the four disputed accounts to either BASI or BNYAS turns on where the original

portfolio revenue was placed.  For the reasons discussed above the revenue and the interest and other

account revenue from the following agreements is attributable to BASI: ICCMIC/Falcon (agreed to by

25

parties); UBS START (paragraphs 53 - 58); and WDR Interim (paragraph 59).  For the reasons

discussed above the revenue and the interest and other account revenue from the following agreements

is not attributable to BASI:  New Nomura loans (paragraphs 50 - 52) and Nomura post April 2001

loans (paragraphs 63 - 66).

70) With respect to account interest for 2002, BNYAS did not provide any back-up

information that would permit the court to allocate interest by specific accounts.  The court will allocate

by account interest revenue ratio from the years 2000 and 2001[5].  The amounts of account interest

properly attributable to BASI are: ICCMIC/Falcon: (i) 2000: $29,320; (ii) 2001: $12,882; UBS

START: (i) 2000: $42,611; (ii) 2001: $9,466; WDR Interim: (i) 2000: $12,279; (ii) 2001: $0;

BNYAS accounts: (i) 2000: $40,916; (ii) 2001: $23,501; Unallocated revenue 2002: $91,672.

71) <u>Deposit Reserve</u>: Deposit reserves are funds that Asset Solutions earns from the short term

investment of cash deposited by customers into their accounts.  The amount of the fees paid to Asset

Solutions for any specific deposit can vary substantially depending upon the investment vehicle in which

the money is placed.  Deposit reserve income was included in the revenue attributed to BASI in 1999

and was aggregated with the specific line items of revenue allocated to BASI.

72) For 2000, BNYAS did not have account specific data concerning deposit reserves

available.  BNYAS had $633,629 in deposit reserve income in 2000.  Initially BNYAS took the

position that since it had no account specific data available it could not allocate what portion of deposit

reserve income was attributable to BASI.  BNYAS thus elected to allocate nothing to BASI and

---

[5] Calculated to be 81.28%.  Total account interest in 2000 and 2001 is $210,344.  Account interest attributable to BASI for 2000 and 2001 is $170,975 which is 81.28% of $210,344.  *See* Pl. Ex. 201.

everything to BNYAS.  Wisely, BNYAS has reconsidered this position and in their post hearing written submissions acknowledged that BASI should be credited with a share of the deposit reserves in 2000.

73) For 2001, BNYAS produced only four months (May, June, July and December) of account by account data concerning deposit reserve income. Deposit reserve income for 2001 was $736,590.  BNYAS stated that account specific data for August through November 2001 was unavailable due to the impact of the 9/11 attack on BNY's facilities located close to the World Trade Center.  For 2002, deposit reserve account by account data for all twelve months is available. BNYAS 2002 deposit reserve fees amounted to $494,299.

74) BASI contends that due to the poor state of the available records, it is appropriate to allocate deposit reserve income for the years 2000, 2001 and 2002 by the applicable revenue ratio. BNYAS disagrees and submits that for 2000 and 2002 BASI should receive 21% of the earned deposit reserves (the amount BNYAS calculates BASI earned in 2002) and 17.1% for 2001 (the highest amount earned in any one month of 2001 of the four months of available figures).

75) In reaching a decision on the appropriate apportionment mechanism, the court has considered that the blame for failing to have account specific deposit reserve data belongs to BNYAS. The court also wants a uniform method that can be applied to the three years in question.  BNYAS' suggested method is not uniform.  The court is also persuaded that the revenue ratio between BNYAS' revenue and BASI's revenue should closely track the allocation of the deposit reserve income between BNYAS and BASI.  The revenue ratios for the years 2000, 2001 and 2002 are set forth in paragraph 79.  The allocation of BASI's share of reserve deposit account interest for 2000, 2001 and 2002 are set forth in paragraph 80.

27

76) <u>Grand Cayman Interest</u>: BNYAS' retained earnings, to the extent not distributed as a dividend, are kept in an interest bearing account in the Cayman Islands.  There was no Grand Cayman interest in 1999.  BASI submits that because Grand Cayman interest is interest earned on the revenue of Asset Solutions, to which BASI is entitled to share, interest earned on such retained funds should be similarly allocated to BASI.  BASI suggests an allocation using the revenue ratio as done in paragraph 75.  BNYAS counters that BASI is seeking a double recovery. Since BASI is seeking prejudgment interest on the amounts that BASI contends that it should have been paid, BASI should not recover any portion of the interest that was earned on the profits that BNYAS retained during the 2000 to 2002 period.  Since the court will recommend the granting of prejudgment interest, the court will not allocate any of the Grand Cayman interest to BASI.

77) <u>SHFS Mutual Funds</u>: As part of the requirements BNYAS has to satisfy to be a rated servicer, BNYAS must maintain a certain amount of cash on hand in a property protection fund available in cases of emergency, to pay insurance, taxes or other charges on property when a borrower defaults or fails to pay.  The property protection fund provides cash used to preserve BNYAS' clients' interests.  When BNYAS was formed, in order to fulfill this requirement, BNY infused $500,000 in cash into the company to be kept in short term investments as the property protection account.  That money is invested in SHFS Mutual Funds.  The income from these investments is included as part of BNYAS' audited revenue.  Since the SHFS Mutual Fund income is earned on money directly traceable to BNY, and is not derived from the "Business" identified in the Second Amendment, no portion of the income should be allocated to BASI.

78) For the reasons discussed above, the figures set forth below properly reflect the revenue

28

derived from the "Business" under the Second Amendment to the Asset Purchase Agreement and

attributable to BASI:

| **Assigned Contracts** | 2000 | 2001 | 2002 |
|---|---|---|---|
| RTC Trusts | 172,988 | 15,982 | 6,071 |
| ICCMIC | 76,327 | 0 | 0 |
| Northern NJ | 1,222 | 0 | 0 |
| Driggs | 51,500 | 59,934 | 55,682 |
| Total | 302,037 | 75,916 | 61,753 |

| **Servicing for Non-Performing Assets** | 2000 | 2001 | 2002 |
|---|---|---|---|
| No revenue recorded | 0 | 0 | 0 |
| Total | 0 | 0 | 0 |

| **Special Servicing-CMBS Transactions** | 2000 | 2001 | 2002 |
|---|---|---|---|
| Perry (Solomon & DLJ) | 219,581 | 0 | 0 |
| Total | 219,581 | 0 | 0 |

| **Services for Commercial Lenders** | 2000 | 2001 | 2002 |
|---|---|---|---|
| Agent Services | | | |
| IBJ Fees and Assignment Fees | 1,256,967 | 372,787 | 302,878 |
| Alabama Pine & Pulp | 0 | 225,725 | 166,000 |
| American Blind | 38,000 | 15,000 | 16,425 |
| Agent Service Wire Fees | 20,000 | 131,955 | 119,820 |
| Non PL Wire Fees | 0 | 10,000 | 7,300 |
| Amerifoods | 0 | 82,975 | 0 |
| Centennial | 0 | 13,050 | 0 |
| Oneita | 18,750 | 3,750 | 0 |
| Pioneer | 4,167 | 40,833 | 25,000 |
| Aladdin | 0 | 83,500 | 41,500 |

29

| | | | |
|---|---:|---:|---:|
| Classic Cable | 0 | 17,500 | 56,250 |
| Komag | 0 | 9,500 | 5,000 |
| GS-Fortress | 0 | 10,833 | 0 |
| Total | 1,337,884 | 1,017,408 | 740,173 |

| Primary & Interim Non-CMBS Servicing | 2000 | 2001 | 2002 |
|---|---:|---:|---:|
| Beckman 2000 | 22,534 | 92,238 | 92,316 |
| Beckman Interest | 22,843 | 22,843 | 0 |
| Bernard Primary | 8,016 | 39,041 | 41,066 |
| New Nomura Loans (Providence Pl) | 0 | 0 | 0 |
| UBS Start | 1,124,103 | 98,655 | 96,233 |
| Warburg DR Interim | 8,106 | 0 | 0 |
| Beal Bank | 0 | 25,536 | 0 |
| Accor/BH Finance | 8,999 | 104,653 | 104,640 |
| BH Trust (Accor I) | 0 | 33,881 | 41,205 |
| Nomura post April 2001 | 0 | 0 | 0 |
| Total | 1,194,601 | 416,847 | 375,460 |

| Collateralized Debt Obligations | 2000 | 2001 | 2002 |
|---|---:|---:|---:|
| Harbour View | 12,670 | 5,093 | 2,606 |
| Oppenheimer Senior | 229,812 | 765,037 | 328,730 |
| Chase Octagon | 123,910 | 375,160 | 140,444 |
| Bank Boston - Long Lane Trust | 97,902 | 252,440 | 263,200 |
| Hypound/Variensbank-Promethus | 90,840 | 287,110 | 107,600 |
| Jordan Company-JZO | 26,425 | 73,650 | 23,100 |
| Phoenix | 1,610 | 18,850 | 16,200 |
| NBAM Sr. Income Fund | 55,538 | 79,100 | 177,475 |
| Magnetite CBO II Ltd. Black Rock | 4,342 | 24,666 | 3,600 |
| Titanium | 0 | 20,625 | 26,000 |
| CDO General Accrual | 101,050 | 0 | 0 |
| Inner Harbor (T. Rowe Price) | 0 | 16,750 | 34,260 |
| Black Rock Financial Mgmt. | 0 | 1,000 | 1,000 |
| Canyon Capital | 0 | 30,845 | 43,700 |
| Dryden CDO | 0 | 10,860 | 49,016 |
| Black Rock Sr. Lane Trust | 0 | 51,925 | 163,275 |
| Canyon Capital CBO 2002-1 | 0 | 0 | 18,433 |

| | | | |
|---|---|---|---|
| Dryden 2002-1 | 0 | 0 | 69,754 |
| Dryden 2002-2 | 0 | 0 | 18,995 |
| Magnetite IV | 0 | 0 | 43,751 |
| Long Lane II | 0 | 0 | 54,310 |
| Total | 744,099 | 2,013,111 | 1,585,449 |

| Surveillance | 2000 | 2001 | 2002 |
|---|---|---|---|
| CNL/FUSI | 3,300 | 13,490 | 15,517 |
| Financial Structures | 1,800 | 21,600 | 21,600 |
| Total | 5,100 | 35,090 | 37,117 |

| **Asset Backed Servicing** | 2000 | 2001 | 2002 |
|---|---|---|---|
| Ashdil | 10,000 | 10,000 | 10,000 |
| Falcoln | 132,737 | 149,856 | 143,210 |
| Falcoln-2001 | 0 | 6,222 | 91,951 |
| Falcoln-Interim2001-1 | 0 | 55,099 | 49,304 |
| Peachtree | 15,000 | 36,851 | 50,397 |
| Alliance Laundry | 242 | 12,371 | 8,071 |
| Bear Sterns | 7,000 | 0 | 0 |
| CIBC | 70,920 | 154,604 | 122,889 |
| Hannon & Armstrong | 17,079 | 51,029 | 59,438 |
| HPSC | 23,250 | 154,829 | 125,535 |
| PMC 2000 | 917 | 12,663 | 9,185 |
| Telemere | 15,000 | 0 | 7,405 |
| NACC Franchise | 1,295 | 0 | 0 |
| PMC 2001 | 0 | 8,064 | 0 |
| Discernus | 0 | 5,000 | 0 |
| Medallion Financial | 0 | 7,500 | 0 |
| Millennium Asset Management | 0 | 10,796 | 0 |
| Neustar | 0 | 2,917 | 2,500 |
| GS ACFI | 0 | 1,667 | 15,760 |
| GS AIFI(SBA) | 0 | 27,500 | 2,038 |
| GS DDJ/Samuels Jewelers | 0 | 2,500 | 11,388 |
| GS Collateral Management | 0 | 5,000 | 2,500 |
| GS-US Bank other | 0 | 5,000 | 118,761 |
| Misc.-Goldman (GS) | 0 | 48,420 | 0 |
| Balboa | 0 | 15,413 | 12,048 |

| | | | |
|---|---:|---:|---:|
| Captec | 0 | 110,900 | 209,603 |
| Captec-interest | 0 | 220,000 | 116,242 |
| Leasing Associates 2002-A | 0 | 0 | 7,831 |
| Leasing Associates 2002-B | 0 | 0 | 4,689 |
| Peachtree Franchise 1999-A | 0 | 0 | 113,378 |
| Peachtree Structured Settlements | 0 | 0 | 28,600 |
| Peachtree Warehouse | 0 | 0 | 500 |
| PMC 2002 | 0 | 0 | 8,741 |
| Peachtree Franchise 1999-A-Interest | 0 | 0 | 18,540 |
| Alliance Laundry 2002 | 0 | 0 | 5,000 |
| HPSC 2002 | 0 | 0 | 51,382 |

Non-categorized income

| | | | |
|---|---:|---:|---:|
| BLX Conventional Funding | 0 | 0 | 9,000 |
| Brook Credit Corp./Red Capital | 0 | 0 | 5,000 |
| Portsmouth | 0 | 0 | 5,000 |
| Stone Street | 0 | 0 | 11,050 |
| US Trust | 0 | 0 | 11,850 |
| Carmike-Service/Assignment Fees | 0 | 0 | 154,750 |
| ExxonMobil | 0 | 0 | 16,890 |
| Misc.-US Bank#2 | 0 | 0 | 33,249 |
| Advocate Capital | 0 | 0 | 5,639 |
| Clark-Bardes | 0 | 0 | 3,000 |
| NCS/LLC | 0 | 0 | 3,000 |
| PFC/Xspand | 0 | 0 | 7,500 |
| Papa Gino | 0 | 0 | 37,501 |

Intercompany Revenue

| | | | |
|---|---:|---:|---:|
| Domestic Structured Finance | 0 | 0 | 200,000 |
| Global Structured Finance | 0 | 0 | 175,000 |
| BNY Capital Corp. | 0 | 0 | 36,391 |
| | ———— | ———— | ———— |
| Total | 293,440 | 1,114,201 | 2,121,706 |

| **Account Interest** | 2000 | 2001 | 2002 |
|---|---:|---:|---:|
| ICCMIC/Falcon | 29,320 | 12,882 | |
| UBS Start | 42,611 | 9,466 | |
| WDR Interim | 12,279 | 0 | |

| | | | |
|---|---|---|---|
| New Nomura Loans | 0 | 0 | |
| Nomura Post April 2001 | 0 | 0 | |
| BNYAS accts. | 40,916 | 23,501 | 91,672 |
| Total | 125,126 | 45,849 | 91,672 |
| Subtotal | 4,221,868 | 4,718,422 | 5,013,330 |

79) In order to calculate a revenue ratio to properly apportion the deposit reserve account interest between BASI and BNYAS, the court will create a fraction using the subtotal numbers set forth directly above for 2000, 2001 and 2002 as the numerator and BNYAS' total revenue for 2000, 2001 and 2002, minus the deposit reserve account interest, as the denominator. The denominator figures are calculated as follows: 2000 ($10,790,276[6] - $303,514 = $10,486,762); 2001 ($9,639,387[7] - $496,599 = $9,142,788); 2002 ($7,001,205[8] - $445,047 = $6,556,158). The revenue ratio figures are calculated as follows: 2000 (4,221,868/10,486,762 = 40.26%); 2001 (4,718,422/9,142,788 = 51.61%); 2002 (5,013,330/6,556,158 = 76.47%).

80) BASI's allocation of the deposit reserve account interest is calculated as follows: 2000 ($18,023 + $285,491 = $303,514) x 40.26% = $122,195; 2001 ($149,310 + $347,289 = $496,599) x 51.61% = $256,295; 2002 ($325,050 + $119,997 = $445,047) x 76.47% = $340,327.

81) The remaining account interest attributable to BASI and BASI's total revenue for 2000, 2001 and 2002 are as follows:

|  | 2000 | 2001 | 2002 |
|---|---|---|---|

---

[6] BNYAS Revenues for 2000.

[7] BNYAS Revenues for 2001.

[8] BNYAS Revenues for 2002.

33

| | | | |
|---|---|---|---|
| Subtotal | 4,221,868 | 4,718,422 | 5,013,330 |
| | | | |
| Deposit Reserve | 122,195 | 256,295 | 340,327 |
| Grand Cayman Interest | 0 | 0 | 0 |
| SHFS Mutual Funds | 0 | 0 | 0 |
| | _____ | _____ | _____ |
| | | | |
| TOTAL BASI REVENUE | 4,344,063 | 4,974,717 | 5,353,657 |

82) The court will calculate the ratio of BASI's total revenue to Asset Solutions' total revenue:

| Year | Asset Solutions' Total Revenue | BASI's Total Revenue | Revenue Ratio |
|---|---|---|---|
| 2000 | $10,790,276 | $4,344,063 | 40.26% |
| 2001 | $ 9,639,387 | 4,974,717 | 51.61% |
| 2002 | $ 7,001,205 | 5,353,657 | 76.47% |

83) The Second Amendment to the Asset Purchase Agreement defines "Pre-Tax Net Income" as "the revenue derived from the Business, minus all expenses, losses and other appropriate charges against income related to the conduct of the Business as calculated by Buyer in accordance with Buyer's usual and customary internal accounting practice."  The parties disagree as to exactly what costs are to be charged to the conduct of BASI's business and sharply disagree what costs are to be charged for use of the Capital America "platform."  The platform was located in Dallas, Texas and consisted of the expenses (rent, personnel, technology, etc.) that had been part of CCA.  BASI's work was located in Bethesda, Maryland.  The acquisition of CCA occurred on April 30, 1999.  In eight of the twelve months of 1999,  platform costs were incurred.

84) BASI alleges that in calculating the 1999 payment, which was the first of four annual installments due to BASI, all appropriate expenses of the "platform" were included in calculating BASI's 30% of the net income.  BASI was charged with a portion of the risk management or legal

34

department in Dallas, a portion of the salary expense for a technology employee, and a portion of the

salary of personnel servicing a portfolio for which BASI received income.  BASI was not assessed the

fixed costs of the platform, but rather the variable costs associated with income producing business for

BASI.   BASI submits that the parties' 1999 calculation of the first installment, when they were not at

odds with each other and prepared after review and negotiation, is the best indication of the parties'

intent and should serve as the guide for allocating the 2000-2002 payments due to BASI under the

Second Amendment.

85) BNYAS alleges the expense language of the Second Amendment is consistent with the

"matching principle," a basic accounting methodology in which revenue is aligned with expense,

matching income for which credit is given with costs associated with generating that income.  BNYAS

maintained records of its expenses and has created spreadsheets which break the expenses allocated to

BASI into categories that mirror BNYAS' internal expense reporting.

86) The impact of the Second Amendment was to exclude from BASI's income: (i) the two

years of guaranteed revenue from the Capital America acquisition; (ii) any income from CMBS Master

and Primary servicing, which was a new line of business acquired in the Capital America transaction;

and (iii) future acquisitions by Asset Solutions.  It does not appear plausible that BASI would trade off

its share in the Capital America guaranteed income, but yet accept an obligation to pay for the fixed

expenses of the platform that BNYAS had acquired.

87) The court finds that the agreement of the parties was that BASI would not share in the

Capital America guaranteed income or in any CMBS servicing revenue, but could use the excess

capacity of the platform that BNYAS had acquired and would be responsible for the variable costs

attendant to that use. This is what the parties did in the calculation and payment of the 1999 installment.

88) The court makes the following specific findings with respect to the expenses to be included in the calculation of net income.

89) <u>Salaries</u>.  The parties do not dispute the total salary costs for BNYAS for the years 2000 - 2002.  The parties differ as to the salary allocations.  BNYAS has allocated portions of individual salaries to either BASI or BNYAS based on the amount of time employees spent working on, or in general support of, projects that generated BASI revenue.  These allocations were based on anecdotal observations by certain BNYAS management personnel.  There are no time records, periodic surveys or relatively contemporaneous conversations with employees to support these allocations.  This lack of objective or verifiable analysis of salary allocations is troublesome for several reasons.  Many of the employee salary allocations were made by individuals who had either little or no supervisory responsibility of the individuals.  The allocations at best were approximations.  The management personnel making these allocations knew at the time the allocations were made that their employer had been sued by BASI for millions of dollars.  The more salary expenses that could be allocated to BASI, the less the defendants would have to pay BASI.  Finally, any notes or written analysis generated by the defendants concerning the formulation of these allocations are no longer in existence.

90) As previously stated, the court finds controlling the parties' 1999 allocations, which are based on the principle that BASI was not to be charged for the fixed Capital America platform costs. Therefore, certain categories of salary expenses, which the parties agreed were the costs of the Dallas Office not charged to BASI in 1999, are excluded from the calculation of expenses attributable to BASI's lines of business for the years 2000-2002.  These categories are: (a) loan servicing (other than

36

for commercial loan servicing); (b) information technology; (c) operations; (d) sales and marketing; (e)

finance and accounting; (f) legal; (g) investor reporting; (h) human resources; and (i) executive

management.

91) The salaries assessable to BASI for 2000-2002 have the following three primary

components: (i) salaries (or a portion thereof) of the Bethesda office personnel; (ii) salaries of asset

managers in the Dallas Office to the extent they worked on BASI's lines of business; and (iii) other

managers in the Dallas Office who worked on specific projects related to BASI's lines of business.

The court adopts the salary calculations as proposed by BASI and contained in Pl. Exs. 209, 222, and

237 (as modified).  The following salaries are to be allocated to BASI for 2000-2002.  (i) 2000:

Bethesda, $351,573; Dallas, $549,865; total: $901,438; (ii) 2001: Bethesda, $165,688; Dallas

$717,842; total: $883,530; and (iii) 2002: Bethesda: $0 (office closed); Dallas (and total) $1,020,885.

92) <u>Benefits</u>. The parties agree that employee benefits should be allocated based on the total

salaries allocated to BASI, *i.e.*, benefits represent a fixed percentage of the salaries for each of the

years 2000-2002.  For 2000 BNYAS' total benefits represented 12.51% of the total salary expense

or $112,803 allocated to BASI; for 2001 BNYAS' benefits represented 13.93% of the total salary

expenses or $123,076 allocated to BASI; for 2002 BNYAS' benefits represented 15.9% of the total

salary expenses or $162,321 allocated to BASI.

93) <u>Rent</u>.  (A) Dallas Office Rent: No Dallas office rent was allocated to BASI in the 1999

calculation.  Rent is a fixed platform expense.  No Dallas office rent will be allocated to BASI during

the years 2000-2002.  (B) Bethesda Rent: Rent for the Bethesda office was allocated to BASI in 1999.

The Bethesda office rent, including all unused space, will be allocated to BASI.  The total Bethesda rent

for each of the applicable years is as follows: (i) 2000: $128,676; (ii) 2001: $146,697; and (iii) 2002: $150,187.

94) <u>Outside Programming Help</u>.  The Outside Programming Help expenses are the costs associated with temporary employees hired for a period to meet certain needs.  It is a variable expense that, to the extent related to a BASI line of business, is chargeable to BASI.  The parties disagree as to the amount appropriately chargeable to BASI for each year, and, once such amount is determined, whether the amount should be amortized or fully expensed to BASI in the year the expense was incurred.   BNYAS' list of outside help expenses, allocated to BASI, are contained in Def. Exs. 91, 130, 153, 165, and 166.

95) The court has reviewed the testimony of Mr. Trotter and Mr. Heys and examined the vouchers for the outside help expenses.   With respect to the issue of amortization, the court finds, in Asset Solutions' general ledger, Asset Solutions amortized such costs over five (5) years, and did not expense, in the year incurred, the cost of third party software and outside consultants with respect to either the LMS and Great Plains Systems.  Due to the number of programmers employed on an almost virtually full time basis and the significant sums spent for compensation (almost $400,000 over three years), the court does not accept BNYAS' characterization of this  work as "maintenance" but rather finds the work performed to be software development.  BNYAS' strategic plan identified these costs as "enhancements" to the system, and not merely maintenance.  The court does not find persuasive BNYAS' argument that under BNY's regular and customary accounting practices, such expenses are expensed and not amortized unless they exceed $1 million.  While it may be appropriate for a business the size of BNY to set an amortization threshold of one million dollars, such an amortization threshold is

inappropriate for a business the size of BASI with gross revenue of approximately ten million dollars. The court will therefore find that the Outside Programming Help incurred with respect to the software used in BASI's lines of business in each of the years 2000-2002 should be amortized over 5 years (the amortization period used by Defendants for their outside programming help on non-BASI business software) when charged to BASI.

96) The court makes the following allocations with respect to the amount of Outside Programming Help to be attributed to BASI which will be amortized over 5 years.

97) For 2000, Defendants and BASI agree that ½ of the time for consultant Kil Choe Caputo should be charged to BASI: $60,508. The court accepts Mr. Trotter's testimony that only ½ of her time should be charged because her function also included working ½ time on the Bank's "Auction" system, unrelated to BASI's lines of business. The defendants claim that the consulting time of five additional individuals (Charles O'Riley at $5,760, Diane Daniels at $22,484, Fauzia Mufti at $5,258, Valarie Johnson at $16,243 and Vanesa Tucker at $3,368) should also be charged fully to BASI. The defendants were unable to provide any records or substantive testimony to support their contention that the programming time spent by these individuals related to any BASI line of business. The invoices relating to these individuals (Def. Ex. 91) fail to identify any specific activities. The court finds that the defendants have not sustained their burden of imposing these costs on BASI and finds that the Outside Programming Help properly attributed to BASI for 2000 is $60,508. When amortized over 5 years, the proper amount to be charged to BASI in 2000 is $12,102.

98) For 2001, BASI contends that no additional Outside Programming Help should be allocated to BASI, because: (i) in his deposition as the Defendants' 30(b)(6) designee, Mr. Heys was

39

unable to provide any information with regard to the allocations proposed by the defendants; (ii) the

trial testimony did not alter his deposition testimony; and (iii) while the invoices for 2001 for Outside

Programming Help were not offered, Heys testified in his deposition that the 2001 invoices had no

information regarding work assignments or whether the individuals worked on BASI or other lines of

business.  The court recognizes that BASI has difficulty contesting the work assignments of the Outside

Programming Help as Mr. Trotter and Mr. Kent left the company in May 2000 and their personal

knowledge is limited.  At trial Mr. Heys testified as to what BASI projects BNYAS' temporary

employees were assigned to, or the administrative support area where they worked. (Heys 3/26/03 Tr.

64:20-70:1).  Mr. Heys was far more specific at trial than he was as the 30(b)(6) designee in this area

of dispute.  The court notes that there were no substantive records produced to support Mr. Heys'

allocations of Outside Programming Help to BASI.  In light of the variance between Mr. Heys'

30(b)(6) deposition and his trial testimony and the absence of supporting records, the court is not

persuaded that the allocations offered by the defendants for Outside Programming Help in 2001 are

correct.  The Outside Programming Help for 2001 that will be allocated to BASI for 2001 is $12,102

which represents the second of the 5 year amortization costs of the 2000 Outside Programming Help.

99) For 2002, the only dispute between BASI and the defendants concerning Outside

Programming Help is whether Asha Nellameli, who provided outside programming help for the

LoanStar system, worked full time on LoanStar for BASI's lines of business, or, as with Ms. Caputo, in

2000, worked ½ her time on the Bank's Auction system.  Mr. Trotter testified that when he was

terminated from Asset Solutions, the company continued to engage an outside consultant to maintain the

Bank's Auction system in Dallas.  There was no testimony introduced to support the contention that

Ms. Nellameli, unlike Ms. Caputo, no longer worked on that system for the Bank. The court infers from the state of the evidence that Ms. Nellameli spent ½ her time working on the Bank's Auction system in 2002. The court finds that the proper amount of 2002 Outside Programming Help allocable to BASI (to be amortized over 5 years) is $73,391. $73,391 divided by 5 equals $14,678. The total Outside Programming Help to be allocated to BASI for 2002 (including the 2002 share of prior years' amortization of $12,102) is $26,780.

100) <u>Third Party Outside Help</u>.   For 2000, there is no dispute between the parties as to the charges for Fitch, S&P and Capital Investment Advisors which total $56,739. With respect to Arthur Anderson, the portion of the cost of the audit attributable to the USAP (relating to Master Servicing), the defendants acknowledge, should be excluded, and the remaining cost of the audit should be allocated based on a revenue ratio. The court has found that the 2000 revenue ratio is 40.26%, resulting in a charge to BASI in 2000 of $12,078. The total charges to BASI in 2000 for third party outside services is $68,817.

101) For 2001, there is no dispute between the parties as to the charges to BASI for Fitch, S&P, title work, CB Richard Ellis, Cushman & Wakefield and Summit National. These items total $82,740. With respect to Ernst & Young, the portion of the cost of the audit attributable to USAP should be excluded as was done in 2000. The remaining costs of the Ernst & Young audit will be allocated to BASI based on the 2001 revenue ratio of 51.61%, resulting in a charge to BASI of $12,902. The court finds that the charges for SS&C ($6,892), Comdisco ($7,416), Leibert Global Services ($3,694) and Electronic Environments ($602) are costs of the Capital America Platform that do not specifically relate to BASI's lines of business. These charges were not assessed against BASI in

1999 and will not be assessed in 2001.  The total amount to be charged to BASI for third party outside services in 2001 is $95,642.

102) For 2002, there is no dispute between the parties as to the outside services charges for Fitch, S&P, title work and Summit National which total $70,491.  The parties agree on the total audit charge of $26,800, and that the revenue ratio should be used to allocate this charge.  Using BASI's 2002 revenue ratio of 76.47%, the correct charge to BASI is $20,494.  The charges for SS&C ($12,517), DSI Technology ($65), Sun Guard Recovery ($8,940) and Electronic Environments ($3,211) are not properly assessable against BASI in 2002 because these charges are costs of the Capital America Platform that do not specifically relate to BASI's lines of business.  These charges were not charged in 1999 and will not be assessed in 2002.  The total amount to be charged to BASI for third party outside services in 2002 is $90,985.

103) Bank Charges as Outside Services.  In 1999, prior to the advent of this litigation and prior to the departure of Trotter and Kent, Asset Solutions and BNY, after discussions, agreed to reduce the charges assessed by BNY against Asset Solutions by two thirds.  In 2000, prior to the departure of Trotter and Kent, Asset Solutions sought a two thirds reduction in bank charges.  The issue was unresolved in June 2000 when Trotter and Kent left.  After Trotter and Kent left, Asset Solutions paid all the written off and disputed bank charges in full and continued to pay the full bank charges as assessed by BNY without material reduction through 2002.  Asset Solutions was a subsidiary controlled by BNY.

104) BNY prepared both consolidated financial statements and consolidated tax returns with Asset Solutions.  Because of this, intercompany charges have no effect on BNY's consolidated

42

financial statements.  However, intercompany charges have a material impact on any damages the defendants would have to pay BASI.  BNY had the capacity to reduce profit allocable to Asset Solutions through the assessment of unreasonable bank charges to Asset Solutions.  To illustrate this point, after Trotter and Kent left in June 2000, Asset Solutions paid the approximately $73,000 that had been deducted from the bank charges in 1999 by agreement of the parties.  The court does not accept this reassessment and will remove the $73,000 from the 2000 bank charges before any allocation of bank charges is made to BASI.

105) The correct aggregate bank charges of Asset Solutions, a portion of which will be allocated to BASI, are as follows: (i) 2000: total bank charges of $191,751, less $73,000, reduced by 2/3 = $39,544; (ii) 2001: total bank charges of $146,361, reduced by 2/3 = $48,738; and (iii) 2002: $166,524, reduced by 2/3 = $55,452.

106) The aggregate bank charges for the years 2000, 2001 and 2002 must be allocated to BASI.  The defendants submit that the bank charges should be allocated based on the actual bank charges to specific accounts of Asset Solutions.  While the court accepts this proposal as an accurate method of allocation, the court is unable to implement it, as the defendants have only provided a two month sample for each year and inadequate evidence to support their allocations. The court will adopt the revenue ratio basis, as it has done several times before, in making the appropriate allocations.  The court finds that the bank charges to be allocated to BASI are as follows: (i) 2000: $39,544 x 40.26% = $15,920; (ii) 2001: $48,738 x 51.61% = $25,154; (iii) 2002: $55,452 x 76.47% = $42,404.

107) Supplies, Postage, Communications and Software:  There is no disagreement between the parties that the total amount of charges in 2000 was $210,436.  BASI contends that this amount should

be allocated based on the applicable revenue ratio.  The defendants submit that these expenses should

be allocated based on headcount.  The drawback in using headcount is that it depends on the parties'

testimony as to which personnel worked on BASI's lines of business.  There is no agreement between

the parties as to which personnel worked on what lines of business.  As the court has done before, it

will employ the annual revenue ratio to make the BASI allocation.  The allocation to BASI in 2000 is

$210,436 x 40.26% = $84,722.

108) The parties agree that the total charges for supplies, postage and communications in 2001

is $173,878.  The court accepts the computer software costs of $8,343 but will not include the

$16,857 in amortization of computer software related to the LMS servicing system, because the LMS

system was primarily used for non-BASI lines of business.  The total charges in 2001 for supplies,

postage, communications and software is $182,221.  As the court has done before, it will employ the

annual revenue ratio to make the BASI allocation.  The allocation to BASI in 2001 is $182,221 x

51.61% = $94,044.

109) The parties agree that the total charges for supplies, postage and communications in 2002

is $130,213.  As was done in 2001 the court will not include the LMS amortization expense of

$62,326.  The court will include a software expense of $15,346.  The total charge in 2002 for supplies,

postage, communications and software is $145,559.  Utilizing the revenue ratio the court finds that the

allocation of these expenses to BASI is $145,559 x 76.47% = $111,309.

110) <u>Travel and Entertainment</u>:  There is no disagreement between the parties as to the gross

amount of travel and entertainment ("T&E") expenses incurred by each employee for the years 2000,

2001 and 2002.  The parties disagree as to which employees should be allocated to BASI, and once

44

allocated, what the proper percent of their salary is to be allocated.

111) BNYAS identified the employees who traveled during the year, how much each individual spent on travel from the company, and then used the "head count and time spent allocation process" which BNYAS proposed earlier to allocate salaries. The court did not accept this process when allocating salaries and will not utilize this process when allocating T&E expenses.

112) In 2000 only the T&E for the Bethesda office employees will be allocated to BASI. BNYAS did not seek to charge BASI for the T&E expenses of the Dallas Office employees for either 1999 or 2000 so there is no basis for allocating any portion of the Dallas Office's 2000 T&E to BASI. The allocation of T&E for the Bethesda Office should be the same percentage as the salaries allocated to BASI.  This results in a total T&E expense allocation to BASI of $37,136.

113) For 2001 and 2002, T&E expenses will be allocated in accordance with the employees' salaries allocated to BASI.  (*See* Paragraph 89-91). This results in the total T&E expense allocation to BASI for 2001 of $25,054 and for 2002 of $36,186.

114) <u>Commissions</u>: There is no dispute between the parties as to the total amount of commissions incurred with respect to BASI's lines of business: (i) 2000: $32,075; (ii) 2001: $43,822; and 2002: $44,184.  The difference between the parties is whether the commissions should be expensed in the years they were paid, or whether the commissions should be amortized over three years which was Mr. Trotter's estimate of the life of the contracts. BASI contends that not amortizing the commissions would unfairly result in BASI being charged for the full commission with respect to a contract in the first years even though contracts starting in 2001 and 2002 have revenue streams that extend into years in which BASI is not entitled to share in such revenue.

115) BNYAS submits that commissions are calculated based upon the anticipated first year revenue of a new contract, not the entire life of the agreement.  Moreover, because a client could always cancel a contract, there is no guarantee as to future revenue.   BNYAS also submits that in calculating the 1999 BASI installment payment, the parties included an expense charge allocated to BASI related to commissions paid on the Perf-O-Log contract.  The court finds the position taken by BNYAS as to the expensing of commissions to be more persuasive that the position taken by BASI.

116) The amount of commissions chargeable to BASI are as follows: (i) 2000: $32,075; (ii) 2001: $43,822; and (iii) 2002: $44,184.

117) <u>Depreciation (Furniture and Equipment)</u>: The depreciation category relates to furniture and equipment depreciation, rental and maintenance costs.  With respect to the depreciation related to the Bethesda office, there is no disagreement between the parties as to the total amount of depreciation with respect to the Bethesda office for 2000 - 2002: (i) 2000: $44,071; (ii) 2001: $34,091; and (iii) 2002: $39,025.  BASI contends that the depreciation amounts for the Bethesda office need to be adjusted for the "out of service" space in Bethesda, on the same basis as BASI contended that rent should be adjusted.  The court has previously determined that there would be no adjustment in favor of BASI for unused space in Bethesda. (*See* Paragraph 93).  Consistent with that determination, the court will not grant BASI an adjustment for unused space in Bethesda and will assign to BASI the total amount of depreciation attributable to the Bethesda office.

118) As to the Dallas depreciation amounts, the parties disagree as to the appropriate allocation.  BNYAS allocated depreciation expenses using a head count approach.  BASI contends that, as with rent for Dallas, depreciation is a fixed "platform expense" that Asset Solutions incurred

46

regardless of the use of the Dallas office by BASI's lines of business. The court has previously ruled that the Dallas office rent is a fixed platform expense and will make the same determination for any depreciation expenses attributable to the Dallas office. Therefore, the following amounts will be assessed against BASI for depreciation: (i) 2000: $44,071; (ii) 2001: $34,091; and (iii) 2002: $39,025.

119) <u>Bonuses</u>: There is no disagreement between the parties as to the allocation of bonuses for 2000. No 2000 bonuses are allocable to BASI. With respect to 2001 and 2002, there is no disagreement as to the gross amount of bonuses recommended for individual employees. As with salaries, the parties disagree as to which employees should be allocated to BASI, and once allocated, what the proper share of their time should be. BASI also contends that the amount of the bonuses for 2001 and 2002 should be reduced to reflect the difference between the amount of bonuses "recommended" and the amount of bonuses actually paid as reflected in Asset Solution's general ledger. As previously noted, the court has accepted BASI's allocation of salaries and will employ the same methodology for the allocation of bonuses. The court finds the recommended bonuses allocable to BASI are: (i) 2001: $113,326; and (ii) 2002: $168,724.

120) The recommended amounts should be conformed to the amounts actually paid per the general ledger. In 2001, the recommended bonuses for all Asset Solutions' employees were $400,000 and the bonuses actually paid were $300,556 for a ratio of 75.139%; and (ii) in 2002, the recommended bonuses for all of Asset Solutions' employees were $400,000 and the bonuses actually paid were $304,169 for a ratio of 76.04225%. The court finds the actual charge for bonuses assessed to BASI is: (i) 2001: $85,152; and (ii) 2002: $128,302.

121) <u>Outside Help</u>: The Outside Help expenses are the costs associated with temporary

47

employees hired for a period to meet certain transient needs.  The parties agree that no outside help

(excluding programming help) was attributable to the BASI lines of business in 2000.

122) For 2001 the court finds that there is insufficient evidence to support an allocation of any

outside help, aside from a charge incurred for the services of Mr. Poff, to BASI.  The court will allocate

$6,386 to BASI in 2001 for outside help.

123) For 2002, BASI does not dispute the allocation of $235,728 by BNYAS to BASI for

outside help.  Therefore, the court will allocate the following amounts to BASI for outside help

(excluding programming help): (i) 2000: $0; (ii) 2001 $6,386; and (iii) 2002: $235,728.

124) Other Expenses: For 2000, there is no disagreement between the parties as to the Other

Expenses to be allocated to BASI - $1,081.

125) For 2001, the parties agree on the following allocations to BASI: $4,155 for

Subscriptions and Dues and $42,224 for Legal Fees.  The parties also agree that the expenses for

Couriers and Advertising, and the credit related to Miscellaneous Expenses should be calculated based

on the applicable revenue ratio.  The revenue ratios as previously determined in paragraph 79 are: (i)

2000: 40.26%; (ii) 2001: 51.61%; and 2002: 76.47%.  A revenue ratio of 51.61% produces the

following allocations for 2001: Couriers, $8,140; Advertising, $13,896; and Miscellaneous Expense

credit ($53,667).  With respect to Burglar Alarms, the court will only allocate the expense of the

Bethesda Alarm, $587, to BASI.  The cost of the Burglar Alarm for the Dallas Office will not be

allocated to BASI, as the court finds this charge to be part of the Platform Expenses which are not to

be borne by BASI.  Storage costs are the expenses associated with off site storage of documents.  The

court will allocate these costs based on location.  Bethesda's storage expenses of $8,109 will be

allocated to BASI, while the Dallas storage expense of $6,748 will be allocated to BNYAS.

126) The expenses related to customer claims, insurance, moving and relocation, other personnel, all other expenses, overtime, and business courses will be allocated based on revenue ratio. The allocations for 2001 are as follows: (i) customer claims: $286; (ii) insurance: $61,926; (iii) moving and relocation: $1,350; (iv) other personnel: $1,192; (v) all other expenses: $2,530; (vi) overtime: $848; (vii) business courses: $671. The severance cost of $9,847 is allocated to BASI, as it reflects the departure of Rob Drews from the Bethesda office. The total Other Expenses allocable to BASI in 2001 are $102,094.

127) For 2002, the parties agree on the allocation of $26,395 of the Legal Fees to BASI. The parties also agree that the expenses for Courier and Advertising should be calculated on the revenue ratio for 2002 which the court has previously found to be 76.47%. The following allocations are made to BASI for 2002: Courier, $11,562; Advertising, $20,257. With respect to burglar alarms, no amount will be allocated to BASI as the Bethesda office was closed in 2002. As done in 2001 the court will allocate storage costs based on location. Bethesda's storage expense of $6,701 will be allocated to BASI, while the Dallas storage expense of $1,035 will be allocated to BNYAS.

128) The expenses related to customer claims, insurance, moving and relocation, other personnel, all other expenses, overtime, business courses and subscriptions and dues will be allocated based on revenue ratio. The revenue ratio for 2002 is 76.47%. The allocations for 2002 are as follows: (i) customer claims: $4,996; (ii) insurance: $63,007; (iii) moving and relocation: $0; (iv) other personnel: $0; (v) all other expenses: $3,924; (vi) overtime: $1,428; (vii) business courses: $1,220 (vii) subscription and dues $9,150. There were no severance costs in 2002. The total Other Expenses

49

allocable to BASI in 2002 are $148,640.

129) <u>IBJ Amortization of Goodwill</u> In 1999 the Bank of New York acquired a portfolio of trust

business from IBJ.  A portion of that business was a servicing activity which was pushed down to

BNYAS to perform.  BNY determined the IBJ goodwill allocation to BASI by deriving the portion of

BNY's entire IBJ expense that related to the anticipated business that had been pushed down to

BNYAS, and then amortizing the BNYAS portion of that goodwill expense over 20 years pursuant to

the usual and customary BNY accounting practice.

130) In 1999, a proportional share of the IBJ goodwill expense was allocated to BASI as part

of the 30% calculation.  BNYAS seeks to allocate $158,253 in both 2000 and 2001 as IBJ goodwill

expense to BASI.  In 2002, pursuant to the dictates of a new accounting rule issued by the Financial

Accounting Standards Board, amortization of the IBJ goodwill expense was no longer appropriate and

was abandoned.

131) BASI does not attribute any of the IBJ goodwill expense to itself for any of the three

years, arguing that, despite the treatment of this expense in 1999, because the expense does not appear

in BNYAS' audited financials, it is not properly allocated to BASI under the Second Amendment.

BASI also alleges that the parties did not specifically discuss or negotiate the IBJ goodwill during their

1999 discussions.  In the alternative, BASI argues that if a portion of the IBJ goodwill is to be attributed

to BASI, the expense should be diminished to take into account the fact that the actual IBJ revenue in

2000 through 2002 did not match the anticipated revenue used when the initial amortization of the IBJ

goodwill was made.

132) Because this charge was included in the 1999 calculations, regardless of whether the

specific item was negotiated or discussed by the parties, the court will include the IBJ goodwill expense for the years 2000 and 2001.  The court will not adjust downward the IBJ goodwill figure to take into account the fact that the actual IBJ revenue in 2000 through 2002 did not match the anticipated revenue used when the initial amortization of the IBJ goodwill was made.  The court accepts BNYAS' position that such an adjustment would be inappropriate from an accounting perspective.  Goodwill amortization is done at the time of purchase based upon the known expense and anticipated revenue.  Amortization is not adjusted over time just because actual revenue numbers come in differently than the original revenue projections.  The amortization figure for IBJ goodwill to be used for 2000 and 2001 is $158,253 for each year.

133) The court finds no other expenses properly allocable to BASI.

134) <u>Summary of Expenses for 2000, 2001 and 2002</u>.  The expenses for the conduct of the "business" as defined in the Second Amendment for the years 2000, 2001 and 2002 are as follows:

| Item of Expense | 2000 | 2001 | 2002 |
|---|---|---|---|
| Salaries | 901,438 | 883,530 | 1,020,885 |
| Benefits | 112,803 | 123,076 | 162,321 |
| Rent | 128,676 | 146,697 | 150,187 |
| Outside Programming Help | 12,102 | 12,102 | 26,780 |
| Third Party Outside Help | 68,817 | 95,642 | 90,985 |
| Bank Charges as Outside Services | 15,920 | 25,154 | 42,404 |
| Supplies, Postage, Communications and Software | 84,722 | 94,044 | 111,309 |
| Travel and Entertainment | 37,136 | 25,054 | 36,186 |
| Commissions | 32,075 | 43,822 | 44,184 |
| Depreciation (Furniture & Equipment) | 44,071 | 34,091 | 39,025 |
| Bonuses | 0 | 85,152 | 128,302 |
| Outside Help | 0 | 6,386 | 235,728 |
| Other Expenses | 1,081 | 102,094 | 148,640 |
| IBJ Amortization of Goodwill | 158,253 | 158,253 | 0 |

|  |  |  |  |
|---|---|---|---|
|  | _____ | _____ | _____ |
| TOTAL EXPENSES: | 1,597,094 | 1,835,097 | 2,236,936 |

135) The court finds that Defendants, The Bank of New York and Asset Solutions, are jointly and severally liable to Bethesda Asset Services, Inc. for thirty percent (30%) of the pre-tax Net Income of Asset Solutions for the years 2000, 2001 and 2002 as follows.

136) For the year 2000:

| | |
|---|---|
| Revenue attributable to BASI's "Business" as defined in the Second Amendment | $4,344,063 |
| Expenses for the conduct of the "Business" as defined in the Second Amendment excluding the Capital America "platform costs" | ($1,597,094) |
| 2000 Pre-Tax Net Income | $2,746,969 |
| 30% of Pre-Tax Net Income | $  824,091 |
| Prejudgment interest from February 14, 2001 to August 31, 2005 @ 9% per annum/ per diem = $203.20 x 1658 days | $  336,906 |
| 2000 TOTAL | $1,160,997 |

137) For the year 2001:

| | |
|---|---|
| Revenue attributable to BASI's "Business" as defined in the Second Amendment | $4,974,717 |
| Expenses for the conduct of the "Business" as defined in the Second Amendment excluding the Capital America "platform costs" | ($1,835,097) |
| 2001 Pre-Tax Net Income | $3,139,620 |
| 30% of Pre-Tax Net Income | $  941,886 |

| | |
|---|---|
| Prejudgment interest from February 14, 2002 to August 31, 2005 @ 9% per annum/ per diem = $232.25 x 1293 days | $   300,299 |
| 2001 TOTAL | $1,242,185 |

138) For the year 2002:

| | |
|---|---|
| Revenue attributable to BASI's "Business" as defined in the Second Amendment | $5,353,657 |
| Expenses for the conduct of the "Business" as defined in the Second Amendment excluding the Capital America "platform costs" | ($2,236,936) |
| 2001 Pre-Tax Net Income | $3,116,721 |
| 30% of Pre-Tax Net Income | $   935,016 |
| Prejudgment interest from February 14, 2003 to August 31, 2005 @ 9% per annum/ per diem = $230.55 x 928 days | $   213,950 |
| 2002 Total | $1,148,966 |

## Lost Opportunity Damages

139) On January 10, 2003, following a four day trial, Judge Messitte ruled that the defendants had breached their contractual obligations to Mr. Trotter under his Employment Agreement by terminating him without cause, had breached their contractual obligations under the Asset Purchase Agreement by refusing to pay the 30 percent of Asset Solutions' Net Income for calendar years 2000, 2001, and 2002 as required by the APA, and that Mr. Trotter was relieved of his obligations under the Non-Competition Agreement dated December 15, 1998.

140) Judge Messitte invited the parties to both brief and submit evidence on the issue of

53

whether Mr. Trotter was entitled to seek "lost opportunity" damages, representing the costs to him of

complying with the Non-Competition Agreement with Asset Solutions from the date of  Mr. Trotter's

termination on May 17, 2000 until January 10, 2003 when the Non-Competition Agreement was set

aside.

141) The Non-Competition Agreement provided that Mr. Trotter could not compete:

against the Company or the Corporate Trust Division [of the Bank] by owning,
managing, operating, joining, controlling, or otherwise carrying on, participating in
the ownership, management, operation, or control of, or being engaged or concerned
with, whether as a principal, agent, independent contractor, employee, or otherwise,
any business or concern engaged in the business of providing loan servicing, asset
management, investor reporting and servicing, asset backed securities (the
'Business').

142) Mr. Trotter contends that pursuant to 28 U.S.C. § 2202 and FRCP 54(c), he is entitled

to receive damages for the value of his lost opportunities to engage in the loan servicing industry,

regardless of whether such damages were demanded in his complaint.  These damages are not only

authorized, but are appropriate, according to Mr. Trotter, in light of the defendants' threats and

repeated efforts to enforce the Non-Competition Agreement which prevented him from obtaining

employment in the only industry he had worked in for more than sixteen years.  Mr. Trotter submits that

the defendants' demands forced him to abandon his area of expertise and start afresh in a new line of

business.

143) The defendants contend that lost opportunity damages are unavailable to Mr. Trotter for

the following reasons: (i) Mr. Trotter never provided the defendants with notice that he was seeking lost

opportunity damages; (ii) Mr. Trotter never attempted to obtain interim injunctive relief against the

Non-Competition Agreement to allow him to seek employment in the loan servicing industry; (iii) the

parties maintain mutual obligations under their contracts, *i.e.*,  Mr. Trotter's severance benefit and

BASI's right to collect its installment payments are contingent on, and in exchange for, Mr. Trotter's

obligation not to compete; (iv) Mr. Trotter has failed to proffer any New York case law in support of a

cause of action for lost opportunity because of compliance with a non-competition agreement that was

retroactively voided at a later date; (v) Mr. Trotter must elect his remedy, *i.e.*, recission and an action

for damages are inconsistent remedies and cannot coexist, as one rests upon the avoidance of the

contract and the other upon its affirmance; and (vi) once the Non-Competition Agreement is voided, to

permit lost opportunity damages would give Mr. Trotter a windfall and double recovery of damages.

144) To prove his lost opportunity damages, Mr. Trotter offered Kerry D. Moynihan[9],

Managing Partner of the Tysons Corner, Virginia office of Christian & Timbers.  Christian & Timbers is

the seventh largest retained executive search consultant firm in the United States.  Mr. Moynihan has

nineteen years of experience in senior executive placement, specializing in the placement of company

directors, CEOs, presidents, COOs, and CFOs.  He received his MBA in finance from the University

of Pennsylvania's Wharton School of Business, and a BA, with honors, in literature from the University

of Virginia.  He has been personally involved in more than 400 executive searches in the past nineteen

years.  While he does not have specific experience in the field of "master" or "special" servicers, Mr.

Moynihan has extensive experience in the financial services industry.  The court will qualify Mr.

Moynihan pursuant to F. R.E. 702 as an expert in executive level employment in the financial services

field.

---

[9] The Defendants moved to exclude from evidence the report of Kerry D. Moynihan dated February 6, 2003 and the expert testimony of Kerry D. Moynihan (Docket No. 118).  The court denied this motion by paper order dated August 27, 2003 (Docket No. 140).

145) Mr. Moynihan was asked to render an opinion on two questions. First, the likelihood that on or after May 30, 2000 Mr. Trotter would have found comparable or better employment than that which he enjoyed as the Chief Executive Officer at BNY Asset Solutions and a Vice President of the Bank, as well as the time frame in which he could have obtained such employment. Second, the compensation he would likely have received particularly in the loan servicing, asset backed securities, mortgages, asset management, etc. segments of the financial services industries; in other words, his lost opportunity costs for being denied the opportunity to obtain employment in these industries for the period from May 30, 2000 to January 10, 2003.

146) With regards to the first issue, Mr. Moynihan opined that Mr. Trotter could have obtained comparable or better employment in the range of 90 to 120 days from the cessation of his employment with BNY Asset Solutions and The Bank of New York had he not been constrained from doing so.

147) With regards to the second issue, Mr. Moynihan opined that Mr. Trotter would have been able to earn in the range of $250,000 to $375,000 in base salary, and an annual bonus in the range of 35% to greater than 100% of base salary. The likely range of his annual cash compensation would most likely been between $333,333 and $750,000 or beyond. Mr. Moynihan believed that Mr. Trotter's compensation would have most probably been at least more than the mid-point of his compensation range and could well have been in the upper reaches of the range. Mr. Moynihan further opined that his numbers did not include long term incentives ("LTI"), such as the value of equity. Mr. Moynihan testified that the annual value of LTI would add an additional 26% to the cash compensation figure. This would yield an annual Total Direct Compensation estimated range of $420,000 to $945,000.

148) In assessing Mr. Trotter's economic potential the court notes that he graduated from Dartmouth College in 1972 with a bachelor's degree in economics and business.  He received his MBA in 1973 from the Amos Tuck School of Business Administration and a law degree from Yale Law School in 1976.  Following law school he was in private practice for 8 years with Melrod, Redman and Gartlan and with Wilkie, Farr and Gallagher, both located in Washington, D.C.  He practiced transactional banking and real estate law.

149) In 1984 Mr. Trotter left private practice and became the Chief Operating Officer of Walker & Dunlop - a large commercial real estate and mortgage banking company located in the District of Columbia.  In 1988 Mr. Trotter left Walker & Dunlop and formed Trotter Kent.  Initially, Trotter Kent developed commercial real estate and land, but shifted into the asset management business, managing troubled loans and real estate projects for the Resolution Trust Corporation.  Trotter Kent also worked as an asset manager for creditor committees in bankruptcies and workouts.

150) The court observed Mr. Trotter as a witness.  His very strong academic and business background were evident during his testimony.  The court also observed that he is intelligent, articulate, and has an engaging personality with a genuine executive presence.  Based upon the testimony of Mr. Moynihan and the court's observation of Mr. Trotter, the court believes that Mr. Trotter could have obtained employment within 90 days of his departure from Asset Solutions and been paid in total direct annual compensation of $682,500, which is the midpoint of the compensation scale testified to by Mr. Moynihan.

151) Mr. Trotter was terminated on May 17, 2000 and released from his obligation to comply with the Non-Competition Agreement by Judge Messitte on January 10, 2003.  Allowing for a 90 day

period to obtain new employment, Mr. Trotter was denied employment opportunities for a period of twenty-nine months.  Mr. Trotter's monthly direct annual compensation as found in paragraph 150 was $56,875 ($682,500 /12 = $56,875).  Twenty-nine months of denied employment opportunities results in total damages of $1,649,375 ($56,875 x 29 = $1,649,375).

152) A plaintiff claiming wrongful termination of employment or breach of an employment contract has a duty to mitigate damages by seeking alternative employment with reasonable diligence. *Sudul v. Computer Outsourcing Servs., Inc.*, 917 F. Supp. 1033, 1048 (S.D.N.Y. 1996); *Ronder v. John Waters Assocs.*, 586 N.Y.S.2d 749 (1992).

153) In the second half of 2000, Mr. Trotter initiated a job search.  His search was limited by the Non-Competition Agreement which prevented his employment in the industries described in the agreement.  His search was impaired as he had spent the last 16 years of his professional life in the loan servicing industry - an industry in which he could no longer be employed.  Mr. Trotter submitted his resume to Korn/Ferry, an executive search firm and also used his network of professional associates to explore employment opportunities.  None of these efforts were successful.

154) In late 2000, Mr. Trotter and Ellen Kirsh, a former general counsel of America Online, formed Infosnap, Inc. which is located in Bethesda, Maryland.  Each person owns fifty percent of the company.  Infosnap provides online data collection and delivery services designed specifically for independent schools.  The company helps schools use the internet, their web sites, their database systems to cut costs and time associated with their inquiry, admission, re-enrollment, and summer program operations.  Since the company was established both Mr. Trotter and Ms. Kirsh have each invested more than a million dollars in the company.  Mr. Trotter devotes at least forty hours per week

to this enterprise.  As of March 2003 neither Mr. Trotter nor Ms. Kirsh have received any salary from the company, nor has the company made a profit.  The company principal asset is the technology that has been developed to conduct its operations.

155) The court acknowledges Mr. Trotter's duty to mitigate damages concerning his lost opportunities' damage claim.  Neither party has presented evidence of what amount of income Mr. Trotter would have made if forced to obtain salaried employment.  While the court believes the figure would be at a minimum $200,000, the court cannot speculate.  However, the court does not need to resolve the proper amount of mitigation, as the court will not recommend the awarding of lost opportunity damages for the legal reasons outlined below.

156) Judge Messitte found that because of the Defendants' breaches of their agreements against Mr. Trotter, the Defendants were not legally entitled to enforce the Non-Competition Agreement against Mr. Trotter.  The Defendants however have received the benefits of the Non-Competition Agreement from May 2000 to January 2003 by enforcing the agreement outside of litigation and thus obtained the benefit of excluding him from the loan servicing industry.  Mr. Trotter submits such a result is contrary to the principle that precludes breaching employers from obtaining the benefits of non-competition provisions.

157) In addition, Mr. Trotter contends that failure to award lost opportunity damages to him would run counter to the concept of "mutuality of obligation" relied upon by courts as the basis for enforcement of non-competition covenants.  Lost opportunity damages are necessary, according to Mr. Trotter, to preserve mutuality between the parties.  Finally, lost opportunity damages are appropriate because it is only those damages that will place Mr. Trotter in the same place he would have occupied

59

absent the Defendants' actions to enforce the Non-Competition Agreement.

158) In evaluating the "mutuality of obligation" argument advanced by Mr. Trotter, it is helpful to set forth what each parties' obligation was under the Asset Purchase Agreement.  The Bank of New York promised to pay to Plaintiffs the initial sum of $5,000,000 and thereafter in calendar years 1999, 2000, 2001 and 2002, thirty percent of the pre-tax net income of BNY Trotter Kent, LLC.  Mr. Trotter was provided employment as Chief Executive Officer and President at a salary of $275,00 per year and Mr. Kent was provided employment as Chief Operating Officer at a salary of $225,000 per year.  In the event that either Mr. Trotter or Mr. Kent was terminated without Cause (as defined in the Non-Competition and Non-Solicitation

Agreement) prior to February 13, 2004, then the terminated officer would continue to receive his salary until the earlier of: (i) the remainder of the calendar year in which such termination occurs, or (ii) February 13, 2004.  In order to continue to qualify for the annual payments in 1999, 2000, 2001 and 2002, either Mr. Trotter or Mr. Kent would have to be employed by the Bank of New York, unless the lack of employment was due to: (i) termination without cause; (ii) death; or (iii) disability.

159) It is important to remember that the Bank of New York could fire either Mr. Trotter or Mr. Kent without cause.  If the Bank took such action, the Bank would be responsible for the payment of salary for the remainder of the calendar year and the remaining 30% pre-tax net income payments.

160) The obligations of Mr. Trotter and Mr. Kent were to transfer the assets of Trotter Kent, Inc. to the subsidiary designated by the Bank of New York,  to be employees of the subsidiary and to comply with the terms of the Non-Competition and Non-Solicitation Agreement.

161) As a result of the judgment to be entered by Judge Messitte, Mr. Trotter will receive all

that he is entitled to receive under the Asset Purchase Agreement - his severance pay, the 30% pre-tax net income tax payments for the years 2000, 2001 and 2002, and nine percent prejudgment interest.

162) In this case, Mr. Trotter has chosen to affirm the contracts he made with the Defendants by suing for damages for breach of contract.  He has chosen not to rescind the contracts with the Defendants, but to enforce his rights under the contracts. The judgment of this court will make him whole by providing him, as the contracts called for, his severance pay, his installment payments and prejudgment interest.  To allow lost opportunity damages would permit double recovery of damages based on inconsistent theories.

### Entitlement to Attorneys' Fees

163) Plaintiffs contend that the defendants are liable for plaintiffs' attorneys' fees and disbursements pursuant to the Asset Purchase Agreement.  Article X, Section 10.01 of the Asset Purchase Agreement states in part:

> (c) Buyer hereby indemnifies Seller and its officers, directors, employees, agents and Affiliates (each a "Seller Indemnified Person") against, and agrees to hold each of them harmless from, any Loss actually incurred or suffered by any of them arising out of:
>
> > (i) any Warranty Breach by Buyer or breach of covenant or agreement made or to be performed by Buyer pursuant to this Agreement; or
> >
> > (ii) the failure of Buyer to satisfy, discharge or pay any of the assumed liabilities.

164) The term "Loss," as used in Section 10.01 of the APA is defined as follows:

> "Loss" means any and all losses, damages, liabilities, expenses (including, but not limited to, reasonable fees and disbursements of counsel), claims, assessments, judgments, liens and other obligations.

61

APA, Art. I, Section 1.01, at 4.

165) Section 10.02 of the APA provides that a party entitled to indemnification shall give

notice to the party required to provide indemnification within 90 days after being notified of any claim,

event or matter as to which indemnity may be sought.  Failure to timely notify the indemnifying party

does not relieve the indemnifying party of its obligations unless the failure to notify materially prejudices

the rights of indemnifying party.

166) Defendants contend that the term "Loss," as used in the indemnification provisions, must

be read in conjunction with paragraph 10.03.  Section 10.03 provides that indemnification shall not be

the exclusive remedy for any claims brought to enforce the covenants of the parties under the APA:

> 10.03 <u>Non Exclusive Remedy</u>.  Indemnification pursuant to this Agreement
> shall be the exclusive right with respect to any breach of any representation
> or warranty or covenant contained in this Agreement, except for claims or
> causes of action (a) that are or may be brought under this Agreement, to
> enforce the covenants of the respective parties or (b) that are based upon
> or involving fraudulent or criminal conduct on the part of any party.

The court construes this provision to mean that an aggrieved party is not limited to seeking

indemnification under the APA from the breaching party, but can also assert any other rights or

remedies available.  The court does not accept the defendants' interpretation of this provision as

requiring the plaintiffs to assert indemnification as a separate cause of action from their breach of

contract claims and that any "Loss" not incurred in pursuing such a separate indemnification clause is

not recoverable.

167) Section 10.04 of the APA provides that the indemnification provision will survive the

Closing and that a two year limitation period is applicable to indemnification arising from breaches of

the warranties and representations made by the parties under the APA.  There is no contractual

limitation period imposed by the APA on indemnification arising from breaches of the "agreements and

covenants" under the APA.

168) Plaintiffs submit that Judge Messitte has already held that the defendants breached their

covenants with the plaintiffs by (i) unilaterally terminating Mr. Trotter's employment and (ii) refusing to

pay BASI 30% of the Net Income of Asset Solutions, representing the balance of the purchase price,

within forty-five days after the end of each of the calendar years 2000, 2001 and 2002 as required by

the Asset Purchase Agreement. Therefore under the indemnification agreement the defendants must

reimburse the plaintiffs for their reasonable attorneys' fees and disbursements incurred in litigating this

matter. *See, e.g., A.G. Ship Maintenance Corp. v. Lezak*, 511 N.Y.S.2d 216, 218, 503 N.E.2d

681,683 (1986) (prevailing parties may collect attorneys' fees from the losing party where such an

award is authorized by an agreement between the parties).

169) The defendants contend that indemnification provisions under New York law are strictly

construed to avoid reading into an agreement a duty not anticipated by the parties.  *See, Buffalo Color

Corp. v. AlliedSignal, Inc.*, 139 F. Supp. 2d 409, 420 (W.D.N.Y. 2001).  The parties did not intend

for the indemnification agreement in this case to cover the attorneys' fees and disbursements incurred in

this action.

170) In addition, prior to the closing of the liability phase of the trial, the plaintiffs never

mentioned the indemnification provision of the APA as a basis for their request for attorneys' fees.

During discovery in interrogatory answers or production of documents, the plaintiffs never  provided

information concerning attorneys' fees as an item of damages. While the plaintiffs may have mentioned

attorneys' fees and costs in their complaint, amended complaint and pretrial order, these references were perfunctory or conclusory statements.  Requests for attorney fees were couched in Federal Rule of Civil Procedure 11 terminology, not indemnification terminology.  The plaintiffs' request for attorneys' fees pursuant to an indemnification clause is a new cause of action that has not been properly pled.[10]

171) As a result of the lack of proper notice the defendants contend they have been materially prejudiced.  They have been unable to take appropriate discovery as to the intent and purpose of the indemnification provision to prove that it was not intended or envisioned to be used in the manner proffered by the plaintiffs. Nor have the defendants been able to move to dismiss the plaintiffs' request for attorneys' fees and disbursements since it was not framed as a substantive cause of action for indemnification.  Finally, they have been prejudiced in settlement negotiations as the indemnification theory for attorneys' fees was never taken into account.

172) Defendants submit that the plaintiffs have not proven the reasonableness of their fees through the use of testimony or affidavits of other professionals attesting to the reasonableness of the fees, relying solely on a comparison of fees expended by plaintiffs compared to those incurred by the defendants.  In addition, the plaintiffs have not segregated out those hours attributable to prove the breach of the APA and any resulting damages, from those hours not related to the Asset Purchase Agreement.

173) Plaintiffs dispute the defendants' assertions concerning attorneys' fees and costs. The

---

[10] Judge Messitte in a January 27, 2003 letter to counsel specifically noted that Plaintiffs' request for attorneys' fees is "not a new cause of action."

plaintiffs contend the defendants are not surprised.  Plaintiffs asserted a claim for attorneys' fees and

costs in their initial Complaint filed on July 12, 2000, and repeated that claim in their Amended

Complaint filed on December 1, 2000.  The plaintiffs assert that the Federal Rules of Civil Procedure

do not require the plaintiffs to set forth the detailed underlying basis for an attorneys' fee claim in the

pleadings.  A claim for attorneys' fees and costs were also in the Joint Proposed Pretrial Order filed on

June 10, 2002, the Revised Joint Pretrial Order filed on June 28, 2002, and the Plaintiffs' Proposed

Findings of Fact and Conclusions of Law filed on December 31, 2002.

174) Plaintiffs allege that Section 10.02(a) of the APA only required Plaintiffs to "give notice"

to the party required to provide indemnification.  The applicable section does not impose any

requirements as to the content of such notice and does not require the plaintiffs to cite Section 10.02(a)

in order to satisfy their notice obligation.  The plaintiffs gave notice of their intent to seek counsel fees in

their pre-suit letters sent in May and June 2000 and in the Complaint and Amended Complaint.  The

attorneys' fees and costs request was not a "new request"  simply because Section 10.01 of the APA

was first articulated as the basis for the award at the end of trial.

175) Plaintiffs reject the defendants' claim that they have been prejudiced by the request for

counsel fees and costs.  Following Judge Messitte's Judgment on Liability (Docket No. 110), the

defendants were afforded an opportunity to obtain written and deposition discovery on this issue.

Judge Messitte also required that both parties exchange copies of their bills for attorney fees and

expenses by February 7, 2003, and granted both parties the opportunity to designate experts on the

attorneys' fee issue, to take discovery on the attorneys' fee issue, and to brief the issue.

176) Federal Rule of Civil Procedure 54(d) and Local Rule 109(2)(a) provide that motions for

65

attorneys' fees and costs must be filed no later than 14 days after entry of judgment.

177) In light of Judge Messitte's ruling providing for the designation of experts and full discovery on the issue of counsel fees, the court does not find that the defendants have been prejudiced. The defendants submit that had they known the indemnification clause would be used as a basis for an attorneys' fees and costs claim, they could have propounded discovery and questioned witnesses on the intent and purpose of the indemnification provision so as "to prove that it was not intended or envisioned to be used in the manner proffered by Plaintiffs." Judge Messitte, however, provided the defendants with this opportunity in his January 29, 2003 Order. In addition, it is well established that extrinsic evidence on such matters as the "intent and purpose" of a contractual provision will not be considered by courts when the text of the provision is itself clear and unambiguous. *See, e.g., Greenfield v. Philles Records, Inc.,* 780 N.E.2d 166, 170 (N.Y. 2002).

178) The plaintiffs contend that the defendants were the drafters of both the Asset Purchase Agreement and its indemnification provision. Thus, any ambiguity in the indemnification provisions would be construed against the defendants. *Uribe v. Merchants Bank of New York*, 693 N.E.2d 740, 743 (N.Y. 1998).

179) The court finds that the indemnification clause set forth in Section 10.01 of the APA does obligate the defendants to reimburse the plaintiffs for their attorneys' fees and costs incurred in prosecuting their claims for breach of covenants or agreements contained in the APA. Specifically, these covenants and agreements relate to the breach of Mr. Trotter's employment agreement and the breach of the agreement to pay thirty percent of the pre-tax net income for the years 2000, 2001 and 2002 to BASI. The court further finds that such indemnification is not a separate cause of action, that

the defendants have received adequate timely notice and an opportunity to conduct discovery and designate experts on the issue, and that the defendants have not been materially prejudiced.

180) On August 3, 2000 Mr. Trotter executed a retainer agreement with the law firm of Dickstein, Shapiro, Morin & Oshinsky ("DSMO") to provide representation of Mr. Trotter in connection with the termination of his Employment Agreement with BNY Asset Solutions and the Bank of New York, and Bethesda Asset Services, Inc.'s entitlement to a share of the rights of BNYAS under an Asset Purchase Agreement.  Daniel M. Litt was designated as the principal attorney involved in the representation at an hourly rate of $340.00.  The letter also provided that Mr. Trotter would be responsible for various disbursements and internal law firm costs incurred in connection with the representation. Over time Mr. Litt's rate has increased on an annual basis to $370.00, $425.00, $475.00 and $495.00.

181) Mr. Litt, the principal attorney for the Plaintiffs, is a graduate of Syracuse University and Georgetown University Law Center, where he was a member and editor of the *Georgetown Law Journal*.  He chairs DSMO's Bankruptcy and Creditors' Rights Practice.  Mr. Litt has extensive experience in commercial litigation and has represented a diverse group of clients in both federal and state courts for over twenty-five years.

182) Mr. Litt has been aided by several lawyers and legal assistants at DSMO.  The principal associate on the case, Charles V. Mehler III, is a 1996 graduate of Washington & Lee University School of Law, where he was a member of the *Washington & Lee Law Review*.  At the time of his work on the case, Mr. Mehler had been practicing law in the state and federal courts for over seven years, concentrating in federal and state court commercial litigation.  Mr. Mehler's hourly rates were

67

$220.00, $295.00 and $335.00.  The principal legal assistant assigned to the case, Peggie Gaskamp, is

a 1986 graduate of the University of Texas.  She has over twelve years of experience as a legal

assistant and significant experience in complex federal court cases.  Her hourly rates were $125.00,

$140.00 and $150.00.

183) The court has reviewed the billing rates and bills for defendants' counsel, Bryan Cave

LLP, for the period October 2000 through January 2003.  It appears that the hourly rates for Bryan

Cave's counsel are fifteen to twenty percent less than those charged by counsel of comparable rank at

the plaintiffs' law firm.  The fact that plaintiffs' rates may be higher may be attributable, in some part, to

the fact that a plaintiff's counsel may hold the account receivable for an extended time prior to

payment[11] and that the certainty of payment for a plaintiff's counsel may be less than that of an attorney

representing a large corporate defendant.  The court notes that Bryan Cave, LLP billed significantly

more hours than the lawyers at DSMO.

184) The court is not without experience is setting fees in federal civil cases.  By examining

other lawyers' invoices in other cases, fee discussions with lawyers at professional gatherings, and a

review of legal periodicals in the Washington metropolitan area, the court has a basis for judging the

reasonableness of the hourly rates charged in cases.  The court finds that the hourly rates charged by

DSMO during 2000 to 2004 time period are reasonable.

185) Pursuant to Judge Messitte's Order of February 10, 2003, both sides have exchanged

counsel fee bills and costs from the inception of litigation to January 2003.  These documents (Pls. Exs.

---

[11] As of September 2004, the plaintiffs had paid DSMO "slightly less than one third of the total attorneys' fees and expenses" incurred in the litigation.  (Docket No. 144, at 3).

271 - 274) have been provided to the court.  From the beginning of litigation through January 2003, the plaintiffs incurred $417,859.53 in fees and expenses.  $384,043.75 is attributable to fees and $33,815.78 is attributable to expenses.

186) During this same period, Bryan Cave, LLP, counsel for the defendants, incurred $1,162,050.27 in fees and expenses.  $1,067,492.38 is attributable to fees and $94,557.89 is attributable to expenses.

187) From late January 2003 through August 31, 2004, the plaintiffs have incurred for the damage phase of the case a total of $343,479.83 in attorneys' fees and expenses.  $323,010.50 is attributable to fees and $20,469.33 is attributable to expenses.  DSMO's monthly invoices for January 2003 through August 2004 are found at Docket No. 144, Attachment B to Exhibit 1.

188) The defendants' counsel, Bryan Cave, LLP, has elected not to disclose its billings for late January 2003 through August 2004 with the court.  The court notes that Bryan Cave, LLP was under no obligation to provide this information.

189) The court has examined each invoice submitted by DSMO and has reviewed the invoices submitted by Bryan Cave, LLC.  In the liability phase, the plaintiffs did not prevail on Count III - a tort claim nor on the punitive damage allegations.  In the damage phase the plaintiffs pursued four types of damages: loss salary, loss of 30% of net pre-tax profit for Asset Solutions for 2000, 2001 and 2002, lost opportunity damages, and request for counsel fees and expenses under the indemnification clause of the Asset Purchase Agreement.  The plaintiffs prevailed on three of the four damage claims.  The plaintiffs should be awarded the reasonable and necessary fees and expenses associated with Counts 1, 2 and 4 of the liability phase and the three successful damage claims.  The plaintiffs are not entitled for

indemnification on Count II, punitive damage allegations, nor their lost opportunity damages claim.

190) DSMO's invoices are not segregated according to individual counts or damage claims. Rather, the invoices are a typical law firm bill setting forth work done on a matter in a chronological fashion. While there is a description of the work done, there is insufficient detail provided to parse out on an entry by entry basis which entries or portions of entries should be disallowed because they relate to unsuccessful liability counts or to the lost opportunities damage claim.

191) The court concludes that the plaintiffs were successful on 75% of their counts litigated in the liability phase of the case and on 75% of their damage claims. A review of the invoices demonstrate that the expenditures for fees and expenses were necessary to achieve the successful results obtained by the plaintiffs. Further, the amounts expended were reasonable considering the qualifications and ability of counsel, the complexity of the issues, and the scope and amount of work entailed in presenting the plaintiffs' case.

192) The court will award in attorneys' fees and expenses 75% of $761,339.36 or $571,004.52.

193) The defendants submit that any indemnification award is subject to a $50,000 deductible pursuant to the terms of the Asset Purchase Agreement. Paragraph 10.01(b) provides in part:

> ...Neither Seller nor the Principals shall be liable under this Section 10.01 with respect to the breach by Seller or the Principals of any of its or their respective representations or warranties contained in this Agreement or the agreements, instruments and certificates delivered in connection with this Agreement unless the aggregate amount of Loss with respect to all such breaches exceeds $50,000 except that the foregoing deductible shall not be applicable to any breach by Seller of the representations or warranties contained in Sections 3.11 and 3.16 or for indemnification pursuant to Section 10.1(a) (v) hereof.

The court does not construe this section as creating a $50,000 deductible for indemnification claims, but rather creating a floor of $50,000 in damages before the obligation to indemnify accrues.  The court will not grant a $50,000 deductible from the attorneys' fees and expenses.

194) The following award is recommended to be entered in favor of the plaintiffs and against the defendants jointly and severally:

| | | |
|---|---|---|
| Unpaid Salary for 2000 | $  169,153.66 | |
| Prejudgment Interest | $    80,583.72 | |
| Total Salary and Interest | | $ 249,737.38 |
| 2000 Pre-Tax Net Income | $  824,091.00 | |
| Prejudgment Interest | $  336,906.00 | |
| Total 2000 | | $1,160,997.00 |
| 2001 Pre-Tax Net Income | $  941,886.00 | |
| Prejudgment Interest | $  300,299.00 | |
| Total 2001 | | $1,242,185.00 |
| 2002 Pre-Tax Net Income | $  935,016.00 | |
| Prejudgment Interest | $  213,950.00 | |
| Total 2002 | | $1,148,966.00 |
| Attorneys' Fees and Expenses | | $   571,004.52 |
| TOTAL | | $4,372,889.80 |

August 30, 2005                                    _____/s/_____
                                                   William Connelly
                                                   United States Magistrate Judge